RICHARD H. GLENN, EARL C. HOOD, HELEN HOOD, CYNTHIA HOOD, TEAKA HOOD, ROBERT HOOD, ERICA HOOD, CHAUNCEY HOOD by his G/A/L AND LEKEITHIA HOOD by her G/A/L v. SMILIE WAGNER d/b/a Salem Manor Motel, B-BOM, INC., and D & S ENTERPRISES, INC.

No. 8221DC1206

(Filed 3 April 1984)

**1. Corporations § 1.1— instructions on noncompliance with corporate formalities and the "instrumentality" doctrine improper**

In an action in which plaintiffs sought recovery against defendant B-Bom, Inc. on the theory that D & S Enterprises, Inc. was operated as a mere instrumentality of B-Bom, Inc. to shield it from liability, and that the corporate entity of D & S Enterprises, Inc. should be disregarded to allow plaintiffs to recover directly from B-Bom, Inc. for damages when defendants trespassed upon their premises by padlocking them out of their apartments, because of the plaintiffs' failure to join David Wagner, the dominant shareholder and president of both corporations, and because of B-Bom's lack of direct ownership in D & S, it was error to include the alternative theory of domination over the corporation by an individual shareholder in the midst of an instruction on the "instrumentality" rule as it applies to parent-subsidiaries or affiliated corporations. Furthermore, the trial judge failed to adequately delineate the relationship holding between B-Bom and D & S so that the jury could correctly apply the instructions given to the evidence.

**2. Corporations § 1.1— "mere instrumentality" corporate law rule improperly instructed upon**

In an action in which plaintiffs sought to recover against defendant B-Bom, Inc. on the theory that D & S Enterprises, Inc. was operated as a mere instrumentality of B-Bom, Inc. to shield it from liability, and that the corporate entity of D & S Enterprises, Inc. should be disregarded to allow plaintiffs to recover directly from B-Bom, Inc. for their damages when defendant Smilie Wagner padlocked them out of their apartments, although the evidence presented was sufficient to support B-Bom's liability because there was evidence of a "complete identity of interest between the two corporations," it was not sufficient to support that conclusion under the instrumentality rule, and the trial judge erred in so instructing. Despite the underlying affiliation between B-Bom and D & S by virtue of common ownership and management, the ability to control D & S arising therefrom was not used by B-Bom to perpetrate the act causing plaintiffs' injuries. The evidence showed that David Wagner, the dominant shareholder and president of both corporations, left general policy and control of D & S to Smilie Wagner. Moreover, the specific policies and practices of padlocking the plaintiffs out of their apartment, storing their furniture and turning back their mail were set and effectuated by Smilie Wagner and his employees and not by either David Wagner or B-Bom itself.

**3. Corporations § 1.1— failure to instruct on excessive fragmentation of a single enterprise into separate corporations and inadequate capitalization—error**

In an action in which plaintiffs sought recovery against B-Bom, Inc. on the theory that D & S Enterprises, Inc. was operated as a mere instrumentality of B-Bom, Inc. to shield it from liability and that the corporate entity of D & S Enterprises, Inc. should be disregarded to allow plaintiffs to recover directly from B-Bom, Inc. for their damages when defendant Smilie Wagner padlocked them out of their apartments, the trial court erroneously failed to instruct the jury on both the doctrines of "excessive fragmentation of a single enterprise into separate corporations" and inadequate capitalization. Plaintiff's evidence was sufficient to establish the four factors which courts have recognized as justifying recovery from an affiliated corporation: (1) David Wagner was a common officer, director and shareholder with ownership of sufficient stock to give him actual working control over both B-Bom and D & S; (2) unified administrative control was thereby maintained by David Wagner over two corporations which essentially shared one asset and his business functions were supplementary; (3) the plaintiffs are involuntary tort creditors; and (4) the debtor corporation, D & S, against which the claim primarily lies, is insolvent. Under the single enterprise theory, the fact that B-Bom through its agent David Wagner *failed to exercise control* over Smilie Wagner's tortious practices would properly be considered a "liability imposing factor," rather than a legal escape route by which B-Bom could evade the responsibilities of rental property ownership. Once the corporate shell of D & S is disregarded, Smilie Wagner would properly be considered to be an agent or employee of B-Bom itself and B-Bom's liability for Smilie's acts would flow from traditional principles of agency or respondeat superior. Furthermore, although the evidence as to D & S's financial structure was scanty, it would appear that D & S had been inadequately capitalized from the time of its inception until its demise. The evidence presented tended to show that a single business entity had been subdivided into an ownership corporation and an operating corporation, with the latter having as its primary asset the lease of a property which was meant to produce income almost exclusively for the owner corporation, and very little else. This structure appeared to leave the creditors of the operating company without proper safeguards for the obligations arising out of the operation of the rental property, and therefore would justify disregarding the separate entity of the debtor corporation.

APPEAL by defendant from *Tash, Judge.* Judgment entered 2 September 1981 in District Court, FORSYTH County. Heard in the Court of Appeals 17 October 1983.

The several plaintiffs initiated this action against the defendants, Smilie T. Wagner and B-Bom, Inc., alleging that while they were tenants upon the premises of the Salem Manor Motel, the defendants had trespassed upon the plaintiff-tenants' premises by padlocking them out of their apartments; had breached the tenants' implied covenants of quiet enjoyment; and had wrongfully

converted their personal property by removing and/or disposing of it. The plaintiffs initially named the apartment manager, Smilie Wagner and the property owner, B-Bom, Inc., as the party defendants. Plaintiffs later amended their complaint to allege that Smilie Wagner was an agent of B-Bom, Inc., and that through him, B-Bom acted to injure the plaintiffs.

Defendants filed an answer and counterclaims in May, 1980. In their answer, defendants denied, *inter alia,* that Smilie Wagner is an agent for B-Bom, Inc. Plaintiffs filed a reply to the counterclaims on 29 May 1980. Apparently an order was entered on 16 September 1980 joining D & S Enterprises, Inc. as a party defendant. It was later stipulated by the parties that Smilie Wagner did act as an employee and agent of D & S Enterprises, Inc. in managing and renting apartments at the location known as Salem Manor Motel.

A trial was held and both parties presented evidence. Plaintiffs sought recovery against defendant B-Bom, Inc. on the theory that D & S Enterprises, Inc. was operated as a mere instrumentality of B-Bom, Inc. to shield it from liability, and that the corporate entity of D & S Enterprises, Inc. should be disregarded to allow plaintiffs to recover directly from B-Bom, Inc. for their damages. Defendant B-Bom, Inc.'s motions for a directed verdict in its favor on this issue were denied. Plaintiffs' motion for a directed verdict against defendants on the issue of conversion was allowed.

The jury returned a verdict for plaintiffs on all of the issues submitted. Judgment was entered thereon 2 September 1981, awarding plaintiffs compensatory damages of $9,007.00. Plaintiffs were also awarded punitive damages. Damages of $15.60 were awarded to defendants by way of counterclaim. Defendant B-Bom, Inc.'s motion for judgment n.o.v. was denied on 17 September 1981. On that same date, the court entered a supplemental judgment, concluding that the defendants' actions constituted unfair trade practices in violation of G.S. 75-1.1 and ordering that the award of compensatory damages be trebled. Defendant B-Bom, Inc. appeals.

*Brenda Wagner-Sumner, for defendant appellant, B-Bom, Inc.*

*Legal Aid Society of Northwest North Carolina, Inc., by Ellen W. Gerber and Gwyneth B. Davis, for plaintiff appellees.*

JOHNSON, Judge.

This appeal primarily involves the question of whether the trial court properly denied defendant B-Bom, Inc.'s (hereafter "B-Bom") motion for a directed verdict on the issue of whether the corporate entity of D & S Enterprises, Inc. (hereafter "D & S"), should be disregarded. Defendant's other arguments relate primarily to the form of the trial court's instructions to the jury on the eleven issues presented. No appeal was taken with regard to the verdict of the jury that trespass, breach of quiet enjoyment and conversion were committed against the plaintiffs as tenants at Salem Manor Motel when they were padlocked out of their apartments and their personal property was disposed of. Nor have defendants appealed from the award of compensatory and punitive damages, or from the conclusion that unfair trade practices had been committed.

I

The events forming the factual background of this action occurred between August, 1979 and January, 1980. They may be briefly summarized as follows: The owner of the Salem Manor Motel at all relevant times was the defendant corporation B-Bom. Salem Manor is located at 2500 Old Greensboro Road in Winston-Salem, North Carolina. Defendant corporation D & S had leased the subject property from B-Bom and operated the motel as an apartment/room rental business and ran the small general store located on the premises. Under the terms of the lease, the bulk of the Salem Manor rents and profits went to B-Bom in the form of rental payments. Defendant Smilie Wagner managed the business on a day-to-day basis, with the advice and consultation of his cousin David Wagner, a 50% stockholder and president of both defendant corporations.

Plaintiff Richard Glenn rented an apartment at Salem Manor Motel from D & S during the fall of 1979. When Glenn fell behind in his rent, his apartment was padlocked by a personal employee of Smilie Wagner's, Mr. Walter Robinson. Sometime after the padlocking of the apartment, Smilie Wagner directed that the personal property found in Glenn's room be moved to a storage room and the room formerly occupied by Glenn cleaned for new occupancy. Some items belonging to Glenn were discarded. Glenn's attempts to arrange for the return of his apartment and

possessions were refused. Ultimately, with the aid of his attorney, he was permitted to search through the storeroom, and he recovered some portion of his property in damaged condition.

The plaintiff Hood family also rented an apartment at Salem Manor Motel during the fall of 1979. They were asked to vacate the premises, although they were not behind in their rent. When they did not do so voluntarily, their apartment was padlocked. Four members of the plaintiff family, including two infants, were inside the apartment when one of Smilie Wagner's employees at Salem Manor, Ms. Loretta Mack, demanded that they leave so that she could padlock the door. Later that night, the padlock was broken off by plaintiff Earl Hood and the family returned to the apartment and remained there until they moved. While plaintiffs were still residing at Salem Manor, Smilie Wagner took the family's mail and returned it to the post office, saying that the mail didn't belong there. Despite their demands, Smilie Wagner would not return their mail.

## II

On 17 October 1980, David Wagner, an officer in both of the defendant corporations, was deposed by the plaintiffs' attorneys. Selected portions of this deposition were properly introduced into evidence as part of plaintiffs' case in chief pursuant to Rule 32(a)(3) of the Rules of Civil Procedure. Defendants introduced testimony by David Wagner and Smilie Wagner concerning the relationship between B-Bom and D & S.

The evidence presented at trial tended to show that B-Bom, Inc.[1] was incorporated in 1973, with David Wagner as one of the original incorporators and member of the original Board of Directors. B-Bom was formed to acquire, lease and manage property, both real and personal. B-Bom owns several pieces of rental property, including Salem Manor. David Wagner and George Hill each own 50% of the stock of B-Bom; they are the only shareholders and selected themselves to be officers of B-Bom. David Wagner runs the company as its president and also acts as its registered agent, keeping the corporate seal in his law office. His law office also serves as the corporate office of both B-Bom and D & S.

---

1. In his deposition, David Wagner testified that "B-Bom" stands for "Black Brothers on the Move."

At trial, Wagner testified that B-Bom purchased the Salem Manor property at a foreclosure sale in 1978 and leased it back to its original owners. Under the lease, the former owners operated the apartment rental business and paid B-Bom a monthly rental out of the proceeds. After that lease was terminated, D & S Enterprises, Inc. was organized to be the lessee of Salem Manor, and to operate the rental business and store located there. However, David Wagner also testified that D & S was "set up mainly to benefit Smilie and as well to help him make some additional funds." The Articles of Incorporation state that the objects of D & S are to lease, acquire and manage rental properties.

"D & S" stands for David and Smilie, that is David Wagner and Smilie Wagner. David Wagner was one of the incorporators and handled all the details of the incorporation process. However, less than 18 months later (at the time of his deposition) David Wagner had no recollection of the occurrence of any of the salient events in the corporate life of D & S, such as whether there was an organizational meeting, when the by-laws were adopted, who was present at the time of their adoption, who was on the initial Board of Directors, nor how many board meetings had been held. He could recall no formal shareholder meetings or annual meetings, but stated that, "Smilie and I met regularly dealing with business matters of that company."

The Articles of Incorporation show that David Wagner was the sole subscribing shareholder in D & S; subscribing 10 shares at a par value of $100.00 per share. David Wagner testified that as of 1980, he and Smilie each owned 50% of the company, however, he could not recall how many shares had been issued. There was no evidence showing whether and to what extent the shares had been paid in by either David or Smilie. David Wagner never received any income or profits from D & S. Smilie Wagner testified that his salary from D & S was lower in the beginning so that they could get the Salem Manor operation "off and running."

At the time D & S was incorporated, and during the period in question, Smilie Wagner was also employed as a property manager by Urban Housing, Inc., which is a corporation solely owned by David Wagner and located on the Salem Manor premises. David and Smilie were the officers of D & S; David Wagner "thought" that he was president and treasurer, and therefore,

that Smilie "must be" vice-president and secretary. D & S had only one business and that was the operation of the rental business and store at Salem Manor. D & S derived its only funds from the rents and the store. At the time of this action, its only assets were some items of personal property.

The only formal instrument executed on behalf of D & S was the lease agreement with B-Bom. David Wagner drafted the lease and signed it both as president of B-Bom and as president of D & S on 1 January 1978. However, D & S was not incorporated until 8 May 1978. Pursuant to the lease, D & S was to pay a monthly rent to B-Bom for Salem Manor from the rentals collected there by D & S. B-Bom received the rent checks through David Wagner and, in part, the proceeds were used to meet the costs B-Bom incurred as owner of Salem Manor. As shareholder of B-Bom, David Wagner received the benefit of one-half of the residue. B-Bom's other shareholder, George Hill, was not involved with D & S itself and was concerned only when D & S defaulted on the lease for a time. B-Bom established the amount of rent to be charged for each of the rental units at Salem Manor.

In all other respects, Smilie Wagner controlled the finances of D & S. He acted as bookkeeper, hired employees, set his own salary and gave monthly accounting statements to David Wagner to review. David testified that he did not place any particular restrictions over Smilie's ability to take funds out of D & S and that Smilie "had a lot of latitude in the operation of that company [D & S], and I did not question too much what he did." David Wagner also testified that he never dealt directly with any of the tenants at Salem Manor and had no involvement with collecting their rents. He characterized his involvement in the apartment rental business as "more of an advisory nature because that business was operated exclusively by Smilie . . . as a general rule he operated the business pretty much as he saw fit." David also testified that he and Smilie met often and did discuss D & S activities, as well as other business David and Smilie had in common, but that he "did not direct or attempt to direct or control the activities of D & S that much."

Both David and Smilie testified that Smilie operated the rental business on the day-to-day basis. Smilie testified that David "didn't set policies per se," but rather gave advice about the

business generally. Smilie testified that he "set the policies" of the Salem Manor management. As to the policy of padlocking, Smilie stated that it had been done by the previous managers and "we just carried it over the new corporation — which is D & S."

In his deposition, David Wagner had testified that with regard to the specific padlocking of the Glenn apartment in the late fall of 1979, it was first brought to his attention after the fact by Glenn's attorney and he then discussed it with Smilie and "suggested it probably wasn't the way he ought to do it." When asked about the Hood case, David Wagner stated that Smilie "has told me he did it [padlocking] with some clients."

By October, 1980, D & S was no longer operating the apartment rental business. The following exchange took place at the Wagner deposition regarding the dissolution of the lease between B-Bom and D & S:

Q. And you said the lease was dissolved. Was there any formality taken to dissolve the lease?

A. When you say formality, I don't know what —

Q. Well, was a letter written to B-Bom informing them that the lease would no longer be in effect?

A. There were no letters written.

Q. So, on or about July 1, 1980, the lease was not renewed by simply not paying rent.

A. That wasn't what I said. I said on or about July 1, Smilie went into business for himself and last week [October, 1980] is when D & S went out of the business of operating Salem Manor.

Q. By going out of business, you mean they simply failed to make a payment to B-Bom?

A. No. *They simply informed B-Bom,* I guess you could say would be the way to do it, and that's kind of difficult to do, *but that's like me informing me, but D & S essentially told B-Bom last week that it's no longer in the business of operating Salem Manor, and B-Bom said, fine.*

Q. *You told yourself, fine?*

A. *That's right.*

David Wagner also testified that after Smilie Wagner left Salem Manor, the store that D & S ran closed down, "but the apartment rentals were still there and, you know someone had to collect the rent, so B-Bom ended up collecting rent after that point [July, 1980]. However, by October, 1980, David Wagner had given Frederick Hunt, an employee of Wagner's other corporation located on the Salem Manor premises, verbal authorization to begin collecting rents from Salem Manor tenants; such rents to be deposited in B-Bom's bank account. D & S as a corporation was never formally dissolved. It is essentially without any assets to satisfy the judgment in this action, inasmuch as the lease with B-Bom constituted the prime asset of D & S.

The parties had stipulated that, at all relevant times, Smilie Wagner was acting as an agent of the defendant, D & S Enterprises, and the trial court so instructed the jury in its charge. However, the court then continued, stating that the parties had also stipulated that Smilie Wagner was not, at any relevant time, acting as an agent of the defendant, B-Bom. The record reveals that no such stipulation was in fact agreed to by the plaintiffs. Rather, it was plaintiffs' theory at trial that Smilie Wagner should be considered the agent of B-Bom because his "employer," D & S was the "alter ego" of B-Bom or the "mere instrumentality" through which B-Bom operated the Salem Manor Motel and injured the plaintiffs. No objection, however, was made by the plaintiffs to this misstatement of the stipulations. Over defendant B-Bom's objection, the trial court submitted ten issues to the jury regarding liability and damages as to all defendants,[2] and one issue concerning the relationship between B-Bom and D & S. Previously, the trial court had indicated to the parties that a separate issue as to whether Smilie Wagner acted as agent for B-Bom would not be submitted to the jury because, in the court's

2. Defendant correctly contends that the issue as to B-Bom's relationship to plaintiffs and/or the other defendants should have been submitted to the jury prior to the issues relating to the possibility of wrongdoing or liability by or against all "defendants," so that the jury would not have been asked to decide "whether or not there was a wrong" prior to deciding who had committed those wrongs. However, we find no prejudice to defendant from the form of issues one through ten.

opinion, plaintiffs' issue number eleven "takes care of B-Bom." Issue number eleven, as submitted to the jury over defendant's objection, is as follows:

> *Did B-Bom, Incorporated, so dominate and control D & S Enterprises, Incorporated that the corporate entity should be disregarded?* The burden of proof on this issue is on the plaintiffs. This means that they must satisfy you by the greater weight of the evidence that D & S Enterprises had no separate role of its own. Under North Carolina law, a corporation which exercises actual control over another, operating the latter as a mere instrumentality or tool, is liable for the torts of the corporation thus controlled. In such instances the separate identities of parent and subsidiary or affiliated corporations may be disregarded.
>
> The corporate entity also may be disregarded if it is totally dominated by an individual shareholder. When a corporation is so operated that it is a mere instrumentality or alter ego of the sole or dominate shareholder and a shield for its activities in violation of the declared public policy or statute of the state, the corporate entity will be disregarded and the corporation and the shareholders treated as one and the same person, it being immaterial whether the sole or dominant shareholder is an individual or another corporation.
>
> The control must be such complete domination of policy and business practice that as to the transactions in question the subservient corporation had no separate mind, will or existence of its own.

Therefore, the plaintiffs must prove by the greater weight of the evidence that B-Bom, Incorporated, through its dominant shareholder, David Wagner, exercised such control over D & S Enterprises, Incorporated that D & S, in effect, had no separate identity, no separate mind or will of its own, but instead there was a complete identity of interest between the two corporations. The jury returned a verdict in favor of all plaintiffs on every issue.

## III

In general, the doctrine that a corporation is a legal entity existing separate and apart from the persons, whether individual

or corporate, composing it is a legal theory introduced for pur-
poses of convenience and to subserve the ends of justice. There-
fore, the concept cannot be extended to a point beyond its reason
and policy, and when invoked in support of an end subversive of
this policy, the concept of corporate separateness and its attend-
ant limited liability may be disregarded by the courts. 18 Am.
Jur. 2d, Corporations, § 14 (1965). The general principles guiding
application of the "alter ego," "instrumentality" or "identity" doc-
trines were summed up by this Court in *Insurance Co. v. Bank*, 11
N.C. App. 444, 453-454, 181 S.E. 2d 799, 805 (1971) as follows:

> A court of equity seeking to do justice among all parties
> looks at the spirit and not the form of transactions . . . It
> regards corporate organization objectively and realistically,
> unencumbered .by fictions of corporate identity, and thus,
> brushing aside form, deals with substance . . . Corporate
> identity offers no bar to equity's pursuit of the "plumb line"
> of right dealing and fair accounting. (Citations omitted.)

In other words, a court will disregard the corporate form or
"pierce the corporate veil" and extend liability for corporate
obligations beyond the confines of a corporation's separate entity
whenever necessary to prevent fraud or to achieve equity. Each
case involving disregard of the corporate entity must rest upon
its particular facts. 18 Am. Jur. 2d, *supra*, § 15.

The principle factors that support an attack on the separate
corporate entity have been summarized as follows:

1. inadequate capitalization ("thin incorporation");

2. noncompliance with corporate formalities;

3. complete domination and control of the corporation so that
it has no independent identity;

4. excessive fragmentation of a single enterprise into
separate corporations.

Robinson, North Carolina Corp. Law, § 2-12 (3d ed. 1983). Our
courts have recognized, either expressly or implicitly, that the
presence of any one of these factors may, in the appropriate case,
justify denial of the privilege of limited liability for the

shareholders or corporations affiliated with the corporation primarily liable for the obligation sued upon.

Defendant argues both that the issue of B-Bom's liability for the injury-producing conduct of D & S should never have been submitted to the jury and that the instructions given on the law of intercorporate liability were misleading, confusing and/or erroneous as a matter of law. It is defendant's contention that B-Bom and D & S are separate corporate entities; that B-Bom is not a shareholder of D & S and that there was no evidence presented to show that B-Bom otherwise exerted control over the policies and practices of D & S; that the only formal relation between the two corporations was that of lessor/lessee; and that B-Bom, as lessor of Salem Manor, cannot be held liable for the torts of its lessee, D & S.

Throughout the trial, and on appeal, the plaintiffs have maintained that D & S had no true corporate existence and.functioned only as a tool or conduit through which B-Bom operated the rental business at Salem Manor.

A

At the outset, we note that the trial judge correctly denied the defendant's motion for a directed verdict. The evidence presented was clearly sufficient to take the case to the jury on the question of B-Bom's liability for the tortious acts of D & S. The problem presented by this case lies with the legal theory under which it was submitted to the jury in other words, with the sufficiency of the evidence to support the trial judge's instructions to the jury.

Rule 51(a) provides that when charging the jury in a civil action, the trial judge shall declare and explain the law arising on the evidence. G.S. 1A-1, Rule 51(a). He must relate and apply the law to variant factual situations presented by some reasonable view of the evidence. *Foods, Inc. v. Super Markets,* 288 N.C. 213, 217 S.E. 2d 566 (1975). This rule confers a substantial legal right and imposes upon the trial judge a positive duty, and his failure to charge on the substantial features of the case arising on the evidence constitutes prejudicial error. *Board of Transportation v. Rand,* 299 N.C. 476, 263 S.E. 2d 565 (1980). Conversely, an instruction relating to a factual situation not properly supported by the

evidence is also erroneous. *Foods, Inc. v. Super Markets, supra; Dennis v. Voncannon,* 277 N.C. 446, 158 S.E. 2d 489 (1968). In either situation, the error is prejudicial and the aggrieved party is entitled to a new trial. *Board of Transportation v. Rand, supra; Foods, Inc. v. Super Markets, supra.* We find both types of errors present in the case under discussion. For the reasons set forth below, the case must be remanded to the Superior Court for a new trial. We turn first to the instructions which the jury did receive on issue number eleven.

B

[1]   The trial judge gave the jury what appears to be a combined instruction on noncompliance with corporate formalities and the "instrumentality" doctrine. The former theory was not directly applicable to the facts of this case, while the latter was simply not supported by any of the evidence presented.

The trial judge correctly stated the rule that the corporate entity may be disregarded if the corporation is totally dominated by an individual shareholder, and operated as his "alter ego," whether the sole or dominant shareholder is an individual or another corporation. In *Henderson v. Finance Co.,* 273 N.C. 253, 160 S.E. 2d 39 (1968), the decision from which the instruction was taken, the Supreme Court held that the corporate entity was properly disregarded and the individual shareholder held liable where the evidence showed that the dominant shareholder of a very closely held corporation "made no effort to keep, or pretense of keeping, his interest and activities separate and apart from those of the corporation." 273 N.C. at 260, 160 S.E. 2d at 44. The *Henderson* court evidently concluded that in addition to his control through stock ownership, the dominant shareholder had failed to observe even the minimum formalities of conducting business in a corporate form, and therefore, was not entitled to the privilege of limited liability on his corporation's obligations.

However, unlike the situation in *Henderson,* the dominant shareholder and president of both corporations, David Wagner, was never joined as a party to the action and plaintiffs did not seek to hold him individually liable on the basis of his stock ownership in D & S. B-Bom and D & S did not stand as parent and subsidiary because B-Bom itself did not own any shares in D & S. The relationship between the two was properly character-

ized as that of affiliated corporations.[3] The rule of *Henderson* properly applies where the corporation to be "disregarded" has been properly incorporated but is thereafter ignored as a separate entity by its *owners* to the detriment of the party injured. Because of the plaintiffs' failure to join David Wagner in this action and B-Bom's lack of direct ownership in D & S, it was error to include the alternative theory of domination over the corporation by an individual shareholder in the midst of an instruction on the "instrumentality" rule as it applies to parent-subsidiaries or affiliated corporations. Furthermore, the trial judge failed to adequately delineate the relationship holding between B-Bom and D & S so that the jury could correctly apply the instructions given to the evidence. We agree with defendant that, given the facts of this case, the instructions were confusing, misleading and erroneous.

## C

[2] The portions of the jury instruction preceding and following the shareholder "alter ego" section state that a corporation which exercises actual control over another, operating the latter as a "mere instrumentality or tool," is liable for the torts of the corporation thus controlled. *See Huski-Bilt, Inc. v. Trust Co.*, 271 N.C. 662, 157 S.E. 2d 352 (1967). The remainder of the charge placed the burden of proof on plaintiffs to prove that B-Bom exercised such control over D & S Enterprises through David Wagner, that D & S had no separate identity of its own, there being a complete identity of interest between the two corporations. Although the evidence presented was sufficient to support B-Bom's liability because there was evidence of a "complete identity of interest between the two corporations," *see infra* Part IV, it was not sufficient to support that conclusion under the instrumentality rule.

That rule apparently arose as a means to distinguish "normal" and "usual" shareholder control by means of voting rights from the direct exertion of working control over corporate ac-

---

3. An affiliated corporation may be defined as a corporation in which the controlling interest is owned by the same person or persons (including corporate persons) who own the controlling interest in another corporation, the latter being, therefore, also an affiliate. *See generally* Latty, Subsidiaries and Affiliated Corporations (1936).

tivities which would justify disregard of the corporate entity in the appropriate case. *See generally* Latty, Subsidiaries and Affiliated Corporations, Chap. VII (1936). The basic test utilized by our courts is as follows:

> "The control necessary to invoke what is sometimes called the 'instrumentality rule' is not mere majority or complete stock control but such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal. It must be kept in mind that *the control must be shown to have been exercised at the time the acts complained of took place in order that the entities be disregarded at the time.*" (Emphasis added.)

*Acceptance Corp. v. Spencer*, 268 N.C. 1, 9, 149 S.E. 2d 570, 576 (1966), *quoting* 1 Fletcher, Cyclopedia Corporations, *perm. ed.*, p. 204 *et seq.* To clarify the meaning of the "instrumentality rule," the following definition was provided in *Acceptance Corp.*:

> The clearest statement we have found with respect to this area of the law is in *Lowendahl v. Baltimore & O.R. Co.*, 247 App. Div. 144, 287 N.Y.S. 62, 76, *affirmed* 272 N.Y. 360, 6 N.E. 2d 56, where the Court said:
>
> "Restating the instrumentality rule, we may say that in any case, except express agency, estoppel, or direct tort, three elements must be proved:
>
> " '(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
>
> " '(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and
>
> " '(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.' See Powell, 'Parent and Subsidiary Corporations,' chapters I to VI, passim, and numerous cases cited."

*Id.; Huski-Bilt v. Trust Co., supra* at 670-671, 157 S.E. 2d at 358; *Insurance Co. v. Bank, supra. See also Ram Textiles, Inc. v. Hillview Mills and Texland Industries v. Hillview Mills,* 47 N.C. App. 593, 267 S.E. 2d 700, *disc. rev. denied,* 301 N.C. 530, 273 S.E. 2d 454 (1980). *See generally* 18 Am. Jur. 2d, Corporations, § 17 (1965).

The evidence presented at trial was simply insufficient to support an instruction of the instrumentality rule as stated in *Acceptance Corp.* and *Huski-Bilt.* Clearly, a substantial identity of ownership and administrative control existed between B-Bom and D & S in the person of David Wagner. In addition, B-Bom set the rental price for the apartment units at Salem Manor. However, B-Bom did not directly own any shares in D & S so as to give it either complete, majority or *any* stock control over the operation of D & S. The uncontroverted evidence also established that the apartment rental business was operated almost exclusively on the day-to-day basis by Smilie Wagner as shareholder, officer and employee of D & S. Also, Smilie had considerable autonomy with regard to D & S finances. As general manager of Salem Manor, Smilie hired employees, directed their activities and compensation and undertook to improve the property. Most importantly, it was Smilie who set the policies of D & S with regard to the rental business and specifically adopted and executed the business practice of padlocking the apartments of renters who were in arrears, storing their property and turning back their mail. In other words, it was Smilie Wagner who controlled D & S policy and practice with "respect to the transaction attacked." David Wagner only learned of these practices *after the fact,* and only after plaintiffs had already been injured thereby. Evidently, as to these practices, D & S had a "mind of its own," and that "mind" was controlled solely by Smilie Wagner.

Accordingly, despite the underlying affiliation between B-Bom and D & S by virtue of common ownership and management, the ability to control D & S arising therefrom was not used by B-Bom to perpetrate the acts causing plaintiffs' injuries. The evidence showed that David Wagner left general policy and control of D & S to Smilie. Moreover, the specific policies and practices of padlocking the plaintiffs out of their apartment, storing their furniture and turning back their mail were set and effectuated by Smilie Wagner and his employees and not by either

David Wagner or B-Bom itself. This factual situation stands in sharp contrast to that presented, for example, in *Insurance Co. v. Bank, supra,* upon which plaintiffs rely to support the verdict.

In that case, the plaintiff corporation instituted an action for declaratory judgment on the issue of whether it was liable to one of the corporate defendants, Northwestern Bank, on a mortgage title insurance policy plaintiff had issued. Subsequent to a certain loan from Northwestern to Hillwest, Inc., secured by the property in question, the title insured by plaintiff's policy was discovered to be defective. Plaintiff refused to pay on the policy. The trial court held for plaintiff, finding and concluding that plaintiff was not liable on the policy by virtue of the fact that Northwestern suffered no actual loss on the loan. This conclusion was, in turn, based upon the finding that Northwestern had relied for its security not on the property insured, but upon the fact that its corporate alter ego, Park Road Professional Center, Inc., had eventually come to acquire the deed of trust securing Hillwest's demand note.

The parties stipulated that the sole shareholder in Park Road held his shares as Trustee for defendant First Atlantic. It was undisputed that First Atlantic was owned and controlled by Northwestern and that the acts of First Atlantic with regard to the disputed transactions were the acts of Northwestern. This Court found abundant evidence of First Atlantic's complete domination and control over Park Road with regard to the transaction attacked, to satisfy the requirements of the instrumentality rule quoted above.

> In the testimony of officers of First Atlantic, we find evidence of this type of control. The testimony of Thomas D. Pearson, a Vice-President of First Atlantic, indicates that he was "named" President of Park Road for the purpose of executing the loan agreement of 17 January 1968. His testimony also establishes beyond question that he personally knew nothing about the affairs of Park Road and little, if anything, about the loan agreement which he signed.

> \* \* \*

> William McClain testified that as President of First Atlantic he negotiated the loan in question with Hillwest on behalf of

Northwestern. McClain testified that he did not know how Mr. Pearson came to be elected President of Park Road Professional Center but stated: "I presume he was appointed for the protection of First Atlantic Corporation, although I do not know." McClain admitted that the reason the loan instruments were assigned to Park Road rather than Hillwest was that "if they were assigned to Park Road Professional Center which we controlled they would be safe to be used." (Emphasis added.)

The above quoted testimony, as well as other evidence appearing in the record, clearly establishes the necessary element of "control." We think it equally clear that this control was used by the dominant corporation, Northwestern, to commit an unjust act in contravention of plaintiff's legal rights. *Lowendahl v. Baltimore & O.R. Co., supra; Acceptance Corp. v. Spencer, supra.*

11 N.C. App. at 450-452, 181 S.E. 2d at 803-805.

Additional evidence of the lack of actual corporate existence was found in the fact that the corporate charter of Park Road was in a state of suspension at all pertinent times, its purported president had never seen any minute books, tax returns or corporate records, and the only indicia of title its purported president had was his recollection that First Atlantic's president, William McClain, told him he was president—an event which McClain apparently did not recall. On these facts, the court had no hesitation in concluding that, "if Park Road exists at all, it exists as a mere puppet and device in the hands of First Atlantic . . . Its policies and practices are dominated to the point that it was 'no separate mind, will or existence of its own and is but a business conduit for its principal.' " (Citations omitted.) 11 N.C. App. at 453, 181 S.E. 2d at 805.

It is evident that the dominant corporation in *Insurance Co.* caused the subordinate corporation to be established solely for the purpose of acquiring the loan instruments in question and exerted its domination and control over that "phantom" corporation with respect to the very transaction plaintiff complained of. As stated above, plaintiffs here have simply not presented any evidence showing B-Bom's direct exercise of control over Smilie Wagner with regard to the acts in question to satisfy the re-

quirements of the instrumentality rule. Therefore, the trial judge erred in giving the jury an instruction on that doctrine because it related to a factual situation not properly supported by the evidence. *Foods, Inc. v. Super Markets, supra; Dennis v. Voncannon, supra.*

The foregoing errors do not mandate the grant of a directed verdict in defendant's favor, however, because the plaintiffs presented sufficient evidence to take the case to the jury upon proper instructions on the related theories of inadequate capitalization and excessive fragmentation of a single enterprise into separate corporations.

### IV

[3] The principal feature of the case arising on the evidence presented, upon which the trial judge erroneously failed to instruct the jury, was the "excessive fragmentation of a single enterprise into separate corporations." Robinson, *supra,* § 9-10. The extension of liability for a corporation's obligations beyond the confines of its own separate entity is appropriate in those cases where an essentially single business or economic enterprise is nevertheless conducted through several separate corporations, either in a parent-subsidiary arrangement or under common ownership as in the case of affiliated corporations. *See* Latty, *supra,* Subsidiaries and Affiliated Corporations, Chap. VIII.

Such a division or fragmentation may take the form of a traditional parent-subsidiary relationship or that of a single individual or group of individuals owning directly the stock of the various corporations which go to make up the single business enterprise. Latty, *supra.* Upon disregard of the separate entity of one of the corporate components, the rights of a creditor of that corporation would be as great against an affiliate with substantial identity of stock interest as against a parent which owns substantially all the stock of a subsidiary. The extent of recovery, however, would properly be limited to the pool of assets of the larger business entity. In other words, only the internal subdivision of the single business entity would be disregarded and the parent or affiliate *stockholders* would nonetheless retain *their* privilege of limited liability. *Id.*

Dean Latty has identified four factors common to those cases in which courts have allowed recovery from the parent or affiliated corporation: (1) corporations with identity or substantial identity of ownership, that is, ownership of sufficient stock to give actual working control; (2) unified administrative control (which follows almost automatically from such ownership) of corporations whose business functions are similar or supplementary; (3) involuntary as opposed to voluntary creditors; and (4) the insolvency of the corporation against which the claim primarily lies. Latty, *supra*, Ch. VIII, §§ 49-51. *See also* 1 Fletcher Cyc. Corps., *supra*, § 43.20; Note, Liability of a Corporation for Acts of a Subsidiary or Affiliate, 71 Harv. L. Rev. 1122 (1958).

The foregoing "single enterprise" theory of inter-corporate liability was implicitly recognized in *Fountain v. West Lumber Co.*, 161 N.C. 35, 76 S.E. 533 (1912). In *Fountain* the defendant, West Lumber Company, owned the trees and timber rights on a certain tract of land. An individual, C. R. Johnson, was president, secretary and virtually the sole shareholder in West Lumber. He was also president and owned practically all the stock in C. R. Johnson Lumber Company, and was also doing an individual business in his own name. All of these "businesses" dealt in lumber and timber, and all were conducted from the same office. Plaintiff entered into a contract with C. R. Johnson whereby plaintiff agreed to cut and manufacture the timber into building materials. After payments for the work fell into arrears, plaintiff first attempted to maintain an action against both Johnson himself and the Johnson Lumber Co. Upon learning that West Lumber actually owned the subject timber rights, plaintiff brought his claim against West Lumber. C. R. Johnson and the Johnson Lumber Company then went into bankruptcy. West Lumber attempted to defend the action on the grounds that it had previously sold the timber rights to Johnson Lumber and that plaintiff's contract was made with Johnson either individually or acting on behalf of Johnson Lumber.

In accordance with the instructions, the jury found that in making the contract, C. R. Johnson was not bona fide acting on behalf of himself or the C. R. Johnson Lumber Company and that in fact, the device of separate corporations was used in order to evade responsibility on the part of West Lumber, Johnson being president and practically sole owner of the stock in both com-

panies. The Supreme Court first observed that where the president of a corporation deals directly in reference to his corporation's property, he is presumed to act on behalf of the corporation. 161 N.C. at 38, 76 S.E. at 535. After stating that the charge correctly and fairly submitted the issues and evidence to the jury, the court upheld the verdict for the plaintiff on the ground that "the jury [has] found that the contract, *notwithstanding the methods and devices used,* was made by the West Lumber Company." *Id.*

Clearly, the *Fountain* court recognized that the doctrine of limited liability is not itself without limitations and refused to allow the internal insulation of liability attempted by the owner's excessive fragmentation of a single business entity into separate corporations to contravene the rights of the plaintiff-creditor. Thus, the creditor of an insolvent corporation may properly recover from the debtor's corporate affiliate where the various corporations are operated under common ownership and unified management; are essentially engaged in the same or supplementary businesses, sharing a single asset or pool of assets among the subdivisions; and under the circumstances it would be unjust to recognize, as a separate entity, one of the individual corporate compartments.

In the case under discussion, the undisputed evidence shows that plaintiffs are involuntary creditors and that D & S is an insolvent corporation. Plaintiffs have also presented evidence tending to show that B-Bom and D & S were affiliated corporations, with a substantial identity of ownership in the person of David Wagner, who also functioned as president of both corporations. David Wagner testified that as president of B-Bom, it was his duty to "run the company." According to the Articles of Incorporation, when D & S Enterprises was incorporated on 8 May 1978, the new corporation subscribed ten shares of stock, all to David Wagner, at a par value of $100 per share. David Wagner was designated as one of the incorporators and a member of the initial Board of Directors. The corporate by-laws of D & S were also drafted by David Wagner. It is clear that although B-Bom and D & S each had one other shareholder besides David Wagner, David Wagner's stock ownership, coupled with his position as president and director of both corporations, gave him actual

working control over B-Bom and D & S with respect to Salem Manor affairs in general.

There was also ample evidence tending to show the consequent unified administrative control of two corporations whose business functions were supplementary. B-Bom owned the Salem Manor property, and relied upon its rental units to supply the funds to meet its mortgage obligations thereon. Although there was some conflict in the evidence as to why D & S was formed, there was sufficient evidence, if believed, to support the conclusion that D & S was formed solely as a vehicle to pass through the rents and profits from Salem Manor to its owner, B-Bom. Indeed, B-Bom decided how much rent should be charged for each of the units of Salem Manor. As president of B-Bom, David Wagner drew up the lease which provided that D & S pay from those rents, first $1,300 and then $1,700 per month to B-Bom in the form of "rent" for the Salem Manor property. David Wagner then signed the lease agreement in his capacity as president of B-Bom and as president of D & S, despite the fact that D & S was not incorporated until four months after the lease was executed. David Wagner received the monthly rent checks from D & S on behalf of B-Bom and deposited them in B-Bom's account.

In addition, the evidence showed that after Smilie Wagner left D & S and D & S had "informed" B-Bom that it was no longer "in the business of operating Salem Manor," B-Bom began collecting the rent from the Salem Manor tenants itself. Later, David Wagner himself gave Frederick Hunt, an employee of Wagner's other wholly owned rental management corporation, Urban Housing, verbal authorization to collect the rents and turn them over to B-Bom.

The location of the principal office for both B-Bom and D & S was 1225 E. Fifth Street in Winston-Salem, North Carolina, which is also the law office of David Wagner. The agent for service of process for both corporations was David Wagner and the corporate records for both corporations, as well as the by-laws and corporate seal of D & S are located in his office.

In his deposition, David Wagner indicated that he had no recollection of the occurrence of any of the usual indicia of corporate existence in the life of D & S. Although David and Smilie testified that business policy and practice, in particular the acts

complained of, were set and executed by Smilie Wagner, both men also testified to almost continuous contact between the two with regard to the business of D & S and the other corporations they were jointly involved with. According to David Wagner, after D & S went out of the business of operating B-Bom's rental property, no formal notice was sent to the owner, but D & S simply "told B-Bom of that fact." David Wagner characterized this notification as a process of "me informing me" and then telling himself, "fine."

Defendant contends that notwithstanding the foregoing evidence tending to show the unified ownership, operation and administration of the two corporations, there was no evidence that any of the general advice David gave Smilie concerning Salem Manor was given in his capacity as an employee or agent of B-Bom as opposed to his capacity as an officer and stockholder in D & S or as an individual attorney. We do not agree.

First, there was no evidence presented which would indicate that David Wagner was ever compensated for acting as counsel for D & S or ever received any income or profit as a shareholder or officer in D & S. He received the benefits of the income produced at Salem Manor solely in his capacity as shareholder in B-Bom. Secondly, in *Fountain v. West Lumber Co., supra,* the court held that "where the president deals directly in reference to his corporation's property, since he has no lawful right to deal with it individually, there should be a presumption that he acted lawfully, and in behalf of the corporation." 161 N.C. at 38, 76 S.E. at 535.

Clearly, David Wagner acted on behalf of his principal B-Bom when he purported to lease Salem Manor to D & S, a corporation he created to operate those premises as its sole business. We think that, under the facts of this case, there is a rebuttable presumption raised that David Wagner acted on behalf of his principal B-Bom *at all times* with regard to Salem Manor. Therefore, absent evidence to the contrary, David Wagner, in his participation in the affairs of D & S with regard to the operation of the rental business at Salem Manor may be presumed to have acted as agent for B-Bom, and not in his individual capacity as either shareholder, officer or attorney to D & S Enterprises.

D & S was essentially a corporation without assets. The only formal activity that D & S is alleged to have entered into was its lease agreement with B-Bom, and that was executed four months prior to its incorporation. By means of the lease device, D & S obtained an asset belonging to B-Bom to manage, but not to own. There was no evidence presented to show whether the shares issued to David Wagner or allegedly owned by Smilie Wagner were ever actually paid in. The picture thus presented is that of two corporations sharing one income-producing capital asset and simply dividing the supplementary functions of ownership and operation into distinct legal entities — in other words, functioning as a single business enterprise in substance, if not in form. Upon such evidence, a jury could properly find that the device of separate corporations was used to evade responsibility on the part of B-Bom. *Fountain, supra.*

In summary, plaintiff's evidence was sufficient to establish the four factors identified by Dean Latty which courts have recognized as justifying recovery from an affiliated corporation: (1) David Wagner was a common officer, director and shareholder with ownership of sufficient stock to give him actual working control over both B-Bom and D & S; (2) unified administrative control was thereby maintained by David Wagner over two corporations which essentially shared one asset and whose business functions were supplementary; (3) the plaintiffs are involuntary tort creditors; and (4) the debtor corporation, D & S, against which the claim primarily lies, is insolvent. In conjunction with these factual circumstances, "[t]he effect of control as a liability imposing factor . . . is ordinarily limited to a situation where control *in fact,* with or without stock ownership, may involve the parent [or affiliate] corporation in liability for having exercised or failed to exercise control in violation of a duty owed to the plaintiff." Latty, *supra,* at 216. In other words, under the single enterprise theory, the fact that B-Bom through its agent David Wagner *failed to exercise control* over Smilie Wagner's tortious practices would properly be considered a "liability imposing factor," rather than the legal escape route by which B-Bom could evade the responsibilities of rental property ownership. Once the corporate shell of D & S is disregarded, Smilie Wagner would properly be considered to be an agent or employee of B-Bom itself and B-Bom's

liability for Smilie's acts would flow from traditional principles of agency or respondeat superior.

Therefore, in terms of structure, finance and operation, the evidence tended to show that the two corporations functioned as a single economic entity and their interests may accordingly be considered "identical" despite the internal compartmentalization of ownership and operation by means of separate incorporation. In such a case, neither the device of a "lease" nor the doctrine of "separate legal entity" may properly be interposed to conceal the true relation between the rental property owner and the operating company. Accordingly, the trial judge had a duty to instruct the jury on the law arising on these substantial features of the evidence, whether or not requested to do so. His failure to do so requires a new trial.

Furthermore, although the evidence as to D & S's financial structure was scanty, it would appear that D & S had been inadequately capitalized from the time of its inception until its unceremonious demise.

One of the foremost requirements for achieving limited liability through use of the corporate form is adequate capitalization. Robinson, *supra*, § 9-8. In an early case, *Insurance Co. v. Edwards*, 124 N.C. 116, 120-121, 32 S.E. 404, 406 (1899), the Supreme Court, in dictum, expressly recognized limited liability as a special privilege and strongly implied that it could be denied on the basis of inadequate capitalization.

> One of the great dangers [with corporations] is the risk of insolvency arising from the want of any personal liability of their stockholders, and the uncertain and perhaps fictitious nature of their assets. Some are afflicted with what may be called *congenital* insolvency. They are born insolvent, capitalized into insolvency at the moment of their creation, and eke out a precarious existence in an apparent effort to solve the old paradox of living on the interest of their debts. Such corporations are . . . intrinsically dangerous. . . .

*See also* G.S. 55-53(h) (provision in the Business Corporation Act section on watered stock liability stating that a shareholder may nevertheless incur unlimited liability under general principles of law or equity arising from the creation or maintenance of an in-

adequately capitalized incorporated enterprise or other abuse of the privilege of achieving limited liability by incorporation).

Such "thin incorporation" can take many forms, one of which is the scheme of "leasing" to the corporation all or most of the property which it needs to operate. *Robinson, supra,* § 9-8, n. 4. When an affiliated or subsidiary corporation runs a substantial business with grossly insufficient capital, combined with the lease device, liability is properly extended to its parent (or affiliate). The justification for unlimited liability in this situation has been succinctly characterized as arising out of the parent corporation's *"attempt to do business without proper safeguards for creditors* — where the property with which the business is done is not risked because the owner in his character of owner doesn't operate and in his character of operator owns nothing to be risked." (Emphasis original.) Latty, *supra* at 112.

Here, the evidence presented tended to show that a single business entity had been subdivided into an ownership corporation and an operating corporation, with the latter having as its primary asset the lease of a property which is meant to produce income almost exclusively for the owner-corporation, and very little else. This structure would appear to leave the creditors of the operating company without proper safeguards for the obligations arising out of the operation of the rental property, and therefore justify disregarding the separate entity of the debtor corporation.

Courts in other jurisdictions have long imposed liability on the parent or affiliated corporation where a creditor would be unjustly injured by judicial recognition of the separate existence of the undercapitalized subsidiary or affiliate. In *Oriental Investment Co. v. Barclay,* 25 Tex. Civ. App. 543, 64 S.W. 80 (1901), the evidence presented at trial disclosed a factual situation remarkably similar to the case at bar. There, the defendant was a Missouri corporation organized to purchase, own and rent buildings. The Missouri corporation owned a hotel in Texas and its stockholders organized an operating company, incorporated in Texas, in which each Missouri stockholder owned a share in the Texas corporation proportionate to that owned in the Missouri corporation. The directors and officers of the Texas corporation were elected by the Missouri corporation, and there was evidence that the Texas corporation had very little operating capital ac-

tually paid in for its shares. The valuable hotel property was then leased to the Texas operating company for a rather small monthly rental; the lease provided that the operating company was to keep the premises in repair. The plaintiffs were hotel employees of the operating company who were injured there by a falling freight elevator.

The defendant hotel owner denied liability on the basis of the lease and the lack of a principal-agent relationship between itself and the operating company. The jury returned a verdict in favor of plaintiffs, finding that the lease was intended to conceal the true relation between the owner of the property and the occupant, and that the Texas operating company was acting as agent for the defendant owner. After an extensive review of the evidence presented concerning the relations between the two corporations, the appellate court affirmed the verdict, stating that the evidence presented tended strongly to show that the Texas corporation "was merely the tool of the investment company, and in operating the hotel was acting as the agent of that company." 64 S.W. at 88.

A similar factual pattern was presented in *Luckenbach S.S. Co. v. W. R. Grace & Co.*, 267 Fed. 676 (4th Cir.), *cert. denied*, 254 U.S. 644, 65 L.Ed. 454, 41 S.Ct. 14 (1920). There, the corporate owner of a fleet of steamships was held liable on a contract which the plaintiff had entered into with the steamship operating company. The evidence showed that the two corporations had the same directors and officers, and a common president who owned substantially all of the stock in each corporation. The operating company had a capital of $10,000, while the owner company was capitalized at $800,000. The steamships in question were leased to the operating company at far below their true rental value.

Based upon the evidence presented, the appellate court had no trouble in concluding that:

[The facts] show such identity of the two corporations, or at least give rise to such a strong presumption of their identity, as warrants the conclusion that the Luckenbach Company is equally responsible with the steamship company for the breach by the latter of its contract with the appellee. For all practical purposes the two concerns are one, and it would be unconscionable to allow the owner of this fleet of steamers,

worth millions of dollars, to escape liability because it had turned them over a year before to a $10,000 corporation, which is simply itself in another form.

267 Fed. at 681. *Accord Joseph R. Foard Co. v. Maryland, ex rel. Goralski,* 219 Fed. 827 (4th Cir. 1914); *Schlamowitz v. Pinehurst, Inc.,* 229 F. Supp. 278 (M.D. N.C. 1964). *See also Walkovszky v. Carlton,* 18 N.Y. 2d 414, 276 N.Y.S. 2d 585, 223 N.E. 2d 6 (1966).

The factual similarities between the *Oriental, Luckenbach* and *Fountain* cases and the case under discussion are striking. All may be considered examples of the "excessive fragmentation" or "single enterprise" theory discussed above, and the holdings, whether couched in terms of "instrumentality" or "agency," all support the conclusion that the purported separate incorporation of D & S as an operating company, coupled with the lease device, will not necessarily stand as a bar to B-Bom's liability for the acts of D & S which caused the plaintiffs' injuries. Under the evidence presented in this case, it would be unconscionable to allow the owner of a valuable apartment/room rental property to escape liability because it turned the property over to an inadequately capitalized operating company "which is simply itself in another form." *Luckenbach, supra.*

### V

In conclusion, the trial judge correctly denied defendant B-Bom's motion to dismiss because the plaintiffs presented sufficient evidence of B-Bom's liability for the torts of D & S to take the case to the jury. However, the trial judge prejudicially erred by (1) giving the jury an instruction relating to a factual situation not properly supported by the evidence (the "instrumentality" doctrine) and (2) by failing to charge on the substantial features of the case arising on the evidence presented (the "single enterprise" or "excessive fragmentation" and "inadequate capitalization" doctrines). Therefore, the case must be remanded for a new trial so that the parties have the opportunity for a jury to consider the issues raised by their evidence on the question of intercorporate liability under the law properly arising therefrom.

We have carefully examined defendants' other assignments of error and find them to be without merit.

New trial.

Chief Judge VAUGHN and Judge WELLS concur.