PILOT TITLE INSURANCE COMPANY v. THE NORTHWESTERN BANK, FIRST ATLANTIC CORPORATION, HILLWEST, INC., AND PARK ROAD PROFESSIONAL CENTER, INC.

No. 7126SC206

(Filed 23 June 1971)

**1. Declaratory Judgment Act § 1— adequate remedy at law**

It is not necessary for plaintiff to show that an adequate remedy at law is unavailable in order for a court to have jurisdiction under the Declaratory Judgment Act.

**2. Declaratory Judgment Act § 1— jurisdiction — showing that litigation is unavoidable**

While the mere fear or apprehension that a claim may be asserted against a party in the future is not grounds for issuing a declaratory judgment, jurisdiction to issue such judgment lies where the court is convinced that litigation, sooner or later, appears to be unavoidable.

**3. Declaratory Judgment Act § 1— liability on title insurance policy — justiciable controversy**

Plaintiff insurer's action seeking a determination as to whether or not it is liable to defendant bank upon a mortgagee title insurance policy presented a controversy justiciable under the Declaratory Judgment Act.

**4. Declaratory Judgment Act § 2; Injunctions § 1— injunction instead of declaratory relief — waiver of objection by defendants**

If plaintiff insurer is entitled to a declaration of non-liability with respect to a portion of the face amount of a policy of mortgagee title insurance which it issued, defendants cannot complain that the court granted injunctive relief, rather than declaratory relief, upon defendants' representation that the injunction would be less objectionable.

**5. Corporations § 1— alter ego or instrumentality doctrine**

Under the "alter ego" or "instrumentality" doctrine, when a corporation is so dominated by another corporation that the subservient corporation becomes a mere instrument, and is really indistinct from the controlling corporation, the corporate veil of the dominated corporation will be disregarded if to retain it results in injustice.

**6. Corporations § 1— subsidiary as alter ego or instrumentality of parent**

Stock ownership alone does not determine whether one corporation is the alter ego of another; in order for such relationship to exist, the parent corporation must have complete dominion of the finances, policies and practices of the subsidiary in respect to the transaction in question.

**7. Corporations § 1; Insurance § 148— corporation as alter ego of bank — mortgagee title insurance**

The evidence supported the trial court's determination that a corporation to which assets of $859,699.93 were endorsed by a bank in connection with a $900,000 loan to another corporation was the

alter ego and instrumentality of the bank, and that the bank sustained no loss with respect to such $859,699.93 by reason of a defect in the borrower's title to property which served as security for the loan; consequently, the bank is not entitled to collect for such $859,699.93 under a $900,000 mortgagee title insurance policy issued on the security property.

APPEAL by defendants, The Northwestern Bank, First Atlantic Corporation and Park Road Professional Center, Inc., from *Godwin, Judge,* 14 September 1970 Special Non-Jury Session of Superior Court held in MECKLENBURG County.

Plaintiff corporation issued a mortgagee title insurance policy in the amount of $900,000 in favor of defendant Northwestern Bank (Northwestern). The policy insured title to a 60,125 acre tract of land, which was purportedly owned in *fee simple* by Hillwest, Inc. (Hillwest), and which was the subject of a deed of trust given by Hillwest to Northwestern as security for Hillwest's demand note, dated 17 January 1968, in the amount of $900,000.

Soon after the loan was closed the parties learned that Hillwest did not have valid title to the 60,125 acres, which was in fact owned by the United States government or other parties. Northwestern demanded payment under its title insurance policy. Plaintiff refused to pay and on 13 September 1968 instituted this action seeking injunctive relief, or in the alternative, relief pursuant to the Declaratory Judgment Act. (G.S. 1-253 *et seq.)*

By agreement the case was heard by Judge Godwin without a jury. The evidence, which consisted principally of stipulations and depositions of officers of the various defendants, tended to show the following: (1) Hillwest received from Northwestern only a bookkeeping credit for $859,699.93 of the $900,000 loan represented by the demand note of 17 January 1968. (2) This credit was donated, without consideration, to Park Road Professional Center, Inc. (Park Road). (3) As a result of this donation of credit Hillwest became insolvent and remains insolvent. (4) Park Road, at all pertinent times, was under the control of Northwestern. (5) Northwestern caused Park Road to use the bookkeeping credit to purchase certain assets from Northwestern. (6) These assets, consisting of various loan instruments and liens arising out of the financing of a motel project of Paway, Inc., were endorsed to Park Road but never left

the actual possession of Northwestern. (7) The corporate charter of Park Road was suspended 1 March 1967 for nonpayment of franchise taxes and at all pertinent times was in a state of suspension.

Judge Godwin entered findings consistent with the evidence and concluded that Park Road is the alter ego of Northwestern; the transfer of the Paway loan instruments and liens to Park Road did not place them beyond Northwestern's control; and consequently, Northwestern suffered no loss with respect to that portion of the $900,000 loan ($859,699.93) which purportedly served as consideration for the transfer.

Judgment was entered reciting that plaintiff was entitled to either injunctive relief or declaratory relief. It further recited that defendants expressed to the court a preference for injunctive relief, finding it less objectionable. In accordance with this expression of preference, the court ordered that Park Road endorse the assets in question back to Northwestern; that the debt incurred by Hillwest pursuant to its note of 17 January 1968 be reduced by the sum of $859,699.93; and that the claim of Northwestern against plaintiff be reduced by a corresponding amount.

Defendants, except for Hillwest, appealed.

Some understanding of events preceding the loan transaction involving defendants is essential to an understanding of the trial court's findings and conclusions.

The evidence tended to show that the transaction in question arose out of efforts by investors and lenders to salvage a motel project of Paway, Inc. (Paway). The project had terminated during construction when a dispute arose between Paway and its construction contractor, Little Corporation.

Paway had arranged construction financing for its motel through Goodyear Mortgage Corporation, a mortgage banking company which is now owned and controlled by Northwestern. (The name of this company has been changed to First Atlantic Corporation and is subsequently referred to as First Atlantic.) First Atlantic in turn arranged to secure the construction funds from its correspondent, First National Bank of Boston (Bank of Boston). The transaction involved the following: First Atlantic delivered its note for $2,700,000 to Bank of Boston. This note was secured by assigning to Bank of Boston two notes given

First Atlantic by Paway in the respective amounts of $1,800,000 and $500,000. These notes were secured by a deed of trust on the motel property. All of the obligations of Paway were guaranteed in writing by investors in the Paway project, including Steve Pappas (Pappas) and Clifford E. Hemingway (Hemingway).

After work on the motel ceased, Northwestern purchased from Bank of Boston all of the loan instruments held by Bank of Boston in connection with the Paway loan, paying therefor $657,166.60, which was the amount owed by Northwestern's subsidiary First Atlantic for construction advances made under its $2,700,000 note. Northwestern also purchased the stock of Little Corporation. The only asset of Little was a judgment in the amount of $245,489.02 obtained against Paway and certain individuals on 17 October 1967. Thus, at this point, Northwestern owned the Paway notes and the deed of trust constituting a first lien on the motel property, and also, the Little Corporation judgment which constitutes a second lien on the property.

Hemingway and Pappas, investors in Paway, learned that 60,125 acres of mountain land in Swain County was available for purchase at a price of approximately $125,000. They decided to purchase the land and take title in the name of Hillwest, a corporation which Pappas served as president and treasurer and Hemingway served as secretary. With the cooperation of Northwestern, the following plan was devised: A loan of $900,000 would be obtained by Hillwest from Northwestern and secured by a deed of trust on the Swain County land. The purchase price for the land and miscellaneous expenses would be paid from each proceeds to be disbursed to Hillwest at the time the loan was closed. The remaining portion of the loan would be used to purchase from Northwestern the various loan instruments and liens on the Paway motel property. These assets, however, would be assigned, not to Hillwest, but to Park Road. An additional loan from Northwestern would enable the Paway project to be completed. Northwestern, through First Atlantic, which controlled Park Road, would then give Hemingway, Pappas, and other Paway investors, options to purchase the stock of Park Road.

Accordingly, a loan agreement, dated 17 January 1968, was entered between Northwestern, Hillwest and Park Road. The agreement incorporated the essentials of the plan. No official of Park Road participated in any of the loan negotiations; how-

ever, an officer of First Atlantic, acting under the direction of First Atlantic's president, signed the agreement as president of Park Road. The loan was made and the Paway loan instruments and liens were transferred in accordance with the agreement. The option agreement was drafted but was never delivered and accepted and therefore never became effective.

Other pertinent facts are set forth in the opinion.

*Ruff, Perry, Bond, Cobb & Wade by James O. Cobb for plaintiff appellee.*

*Jack T. Hamilton and Fairley, Hamrich, Monteith & Cobb by James D. Monteith for defendant appellants The Northwestern Bank, First Atlantic Corporation, and Park Road Professional Center, Inc.*

GRAHAM, Judge.

Appellants contend plaintiff does not have standing to seek injunctive relief, urging the well established principle that injunctive relief will be granted only where there is not a full, adequate and complete remedy at law. *In re Davis*, 248 N.C. 423, 103 S.E. 2d 503; *Cotton Mills Co. v. Duplan Corp.*, 245 N.C. 496, 96 S.E. 2d 267.

Appellants' position is that plaintiff has an adequate remedy at law in that it could assert any matters asserted here as a defense to an action brought by defendant to recover under the policy. Whether this obviously available legal remedy would be so practical and efficient as to constitute it "full, adequate and complete" presents a close question. We are constrained to hold, however, that appellants' selection of injunctive relief in the trial court, in lieu of declaratory relief, forecloses their raising this question here—unless of course, plaintiff has no standing to seek a declaration of its rights pursuant to the Declaratory Judgment Act.

The Uniform Declaratory Judgment Act is to be liberally construed and administered. G.S. 1-264 provides: "This article is declared to be remedial, its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations, and it is to be liberally construed and administered."

[1] For a court to have jurisdiction under the Act it is not necessary for a plaintiff to show that an adequate remedy at law is unavailable. "It is required only that the plaintiff shall allege in his complaint and show at the trial, that a real controversy, arising out of their opposing contentions as to their respective legal rights and liabilities under a deed, will or contract in writing, or under a statute, municipal ordinance, contract or franchise, exists between or among the parties, and that the relief prayed for will make certain that which is uncertain and secure that which is insecure." *Light Co. v. Iseley,* 203 N.C. 811, 167 S.E. 56.

[2] It is true that a mere fear or apprehension that a claim may be asserted against a party in the future is not grounds for issuing a declaratory judgment. *Newman Machine Co. v. Newman,* 2 N.C. App. 491, 163 S.E. 2d 279. (Reversed on other grounds, 275 N.C. 189, 166 S.E. 2d 63.) However, jurisdiction lies where the court is convinced that litigation, sooner or later, appears to be unavoidable. 22 Am. Jur. 2d, Declaratory Judgments, § 11, p. 851.

Before this action was instituted Northwestern made formal claim and demand that plaintiff pay the entire amount of its policy. There can be no doubt that litigation was forthcoming. Certainly plaintiff should not be required to await suit, perhaps indefinitely, thereby running the risk that evidence relating to this very complicated and unusual set of facts would be lost. This is especially true since in the meantime plaintiff would have to maintain sufficient reserves to cover Northwestern's claim for $900,000. See *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 57 S. Ct. 461, 81 L. Ed. 617.

[3, 4] We hold that plaintiff's action for a declaratory judgment is maintainable. If, as the trial court concluded, plaintiff is entitled to a declaration of non-liability with respect to the $859,699.93 of its policy amount, appellants cannot complain that the court granted injunctive relief, rather than declaratory relief, upon appellants' representation that the former would be less objectionable.

[7] The principal question remaining is whether the trial court correctly held, in effect, that Park Road is at most the alter ego or instrumentality of Northwestern; and that consequently, in endorsing the assets in question to Park Road, Northwestern

did nothing more than endorse them to itself. If these conclusions are sound, it must necessarily follow that Northwestern has sustained no loss with respect to the portion of the loan allocated for the assets; and that plaintiff is not liable under its title insurance policy for this sum.

[5]   The "alter ego" or "instrumentality" doctrine states that: "[W]hen a corporation is so dominated by another corporation, that the subservient corporation becomes a mere instrument, and is really indistinct from the controlling corporation, then the corporate veil of the dominated corporation will be disregarded, if to retain it results in injustice." *National Bond Finance Co. v. General Motors Corp.*, 238 F. Supp. 248 (W.D. Mo. 1964), aff'd, 341 F. 2d 1022 (8th Cir. 1965). In accord: *Acceptance Corp. v. Spencer*, 268 N.C. 1, 149 S.E. 2d 570.

The parties stipulated that at all pertinent times Park Road had outstanding one stock certificate for 50,000 shares of common stock and that the certificate, which has been lost or misplaced, is in the name of Jack T. Hamilton, Trustee for First Atlantic. It is undisputed that First Atlantic is owned and controlled by Northwestern and that the acts of First Atlantic, insofar as the matters here involved are concerned, are the acts of Northwestern.

[6]   Stock ownership alone, however, is not a determining factor. There must be "[c]ontrol, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own. . . ." *Lowendahl v. Baltimore & O. R. Co.*, 247 App. Div. 144, 287 N.Y.S. 62, 76, aff'd, 272 N.Y. 360, 6 N.E. 2d 56; *Acceptance Corp. v. Spencer, supra.*

In the testimony of officers of First Atlantic, we find evidence of this type of control. The testimony of Thomas D. Pearson, a Vice-President of First Atlantic, indicates that he was "named" President of Park Road for the purpose of executing the loan agreement of 17 January 1968. His testimony also establishes beyond question that he personally knew nothing about the affairs of Park Road and little, if anything, about the loan agreement which he signed. Mr. Pearson stated:

"I was made President around December of 1967 or January 1968 and I have been President of Park Road Professional Center, Inc. ever since that date. I am President of Park Road Professional Center, Inc. at the present time. I do not know whether or not any Federal or North Carolina income tax returns were prepared for Park Road Professional Center for the years 1967 and 1968. . . . I was told by Bill McClain [President of First Atlantic] that I had been elected President of Park Road Professional Center, Inc. . . . I don't think I am a director of Park Road Professional Center, Inc., but I don't know whether I am or not. I am not a stockholder of Park Road Professional Center, Inc.

I did not ask anyone to make me President of Park Road Professional Center, Inc. I do not remember exactly what Mr. McClain said to me when he told me I was President. It was to the effect that Park Road was a company that First Atlantic held and that as an employee of First Atlantic he wanted me to be President of this corporation and I said okay. I have never seen the stock book of Park Road Professional Center, the corporate minute book, the Articles of Incorporation, or any financial statements for Park Road Professional Center, Inc. I have never seen any books or records of Park Road Professional Center, Inc. As President of Park Road Professional Center I signed a Loan Agreement of January 17. I think Mr. McClain asked me to sign it I do not remember how soon it was after he had asked me to be President that he asked me to sign the Loan Agreement, but it was soon after he asked me to be President of Park Road. I don't remember whether it was on the same day that I was told to be President or not. . . . I remember signing the document. I did not read it over in great detail before I signed it. I believe Bill McClain presented the document to me for signature. I do not recall what he said to me when he handed me the document. I would imagine he asked me to sign it but I don't know. I was not shown a copy of the document in advance. I did not participate in any discussions between The Northwestern Bank, Park Road Professional Center, Inc. and Hillwest prior to signing the document. I know nothing about the contents of the Loan Agreement and knew nothing about

negotiations or discussions which resulted in the Loan Agreement until it was presented to me by Mr. McClain for signature. I don't think I have had any discussions with The Northwestern Bank and its representatives or Hillwest, Inc. and its representatives concerning the Loan Agreement after its execution.

. . . The only thing I remember engaging in in any sort on behalf of Park Road Professional Center is the execution of the Loan Agreement labeled 'Plaintiff's Exhibit A.' I do not know who I succeeded as President of Park Road Professional Center, Inc. I do not have the North Carolina Franchise Tax Return for Park Road Professional Center for the years 1967 and 1968 as required pursuant to the Court Order for the examination. I have never seen them and I have never been told by anybody that they existed. I do not know that there are any Franchise Tax returns for 1967 and 1968."

William McClain testified that as President of First Atlantic he negotiated the loan in question with Hillwest on behalf of Northwestern. McClain testified that he did not know how Mr. Pearson came to be elected President of Park Road Professional Center but stated: "I presume he was appointed for the protection of First Atlantic Corporation, although I do not know." McClain admitted that the reason the loan instruments were assigned to Park Road rather than Hillwest was that "if they were assigned to Park Road Professional Center *which we controlled* they would be safe to be used." (Emphasis added.)

The above quoted testimony, as well as other evidence appearing in the record, clearly establishes the necessary element of "control." We think it equally clear that this control was used by the dominant corporation, Northwestern, to commit an unjust act in contravention of plaintiff's legal rights. *Lowendahl v. Baltimore & O. R. Co., supra; Acceptance Corp. v. Spencer, supra.*

The circumstances surrounding the loan to Hillwest point to an unusual and highly questionable transaction. In fairness to the defendants, it should be pointed out that there is no evidence that any of them had knowledge, at the time the loan was closed, that there was a defect in title to the 60,125 acres of mountain land. (Hemingway did testify that shortly after the

deed was recorded someone told him, he thought jokingly, that he had just purchased the Indian Reservation.) Other badges of questionability, however, are clearly present. For instance, no representative of any of the parties ever saw any part of the 60,125-acre tract of land. No formal appraisal was made by Northwestern. Hillwest never made written application for the loan and was not required to furnish Northwestern with a statement of its financial worth. The $900,000 loan was made to Hillwest, a corporation that was obviously without net assets, save for its title to land which it was purchasing with less than 20% of the money being borrowed. The conclusion is inescapable that Northwestern did not rely for its security upon the security afforded by the deed of trust on the mountain land or the execution by Hillwest of the demand note. Rather, it relied upon the fact that through its control of Park Road, control of the Paway loan instruments would be retained.

The matter comes down to a simple question of whether plaintiff may be subjected to liability for a loss that is illusory rather than real. Northwestern has parted with none of the $859,699.93 involved in this action. All that it has done has been to endorse the Paway loan instruments and liens to Park Road, which is at best little more than a corporate phantom. The corporate charter of Park Road was in a state of suspension at all pertinent times. Its only stock certificate is lost. Its purported president has never seen any minute books, tax returns or corporate records—if any exist plaintiff's extensive discovery proceedings did not uncover them. No corporate secretary attested the signature of the purported president of Park Road to the loan agreement. No corporate seal was affixed thereto. No corporate officer, or anyone else verified or signed the answer in this case on behalf of Park Road. The only indicia of title its purported president has is his recollection that First Atlantic's president, William McClain, told him he was president—an event Mr. McClain apparently does not recall.

This much is known—if Park Road exists at all, it exists as a mere puppet and device in the hands of First Atlantic. See *Henderson v. Finance Co.,* 273 N.C. 253, 160 S.E. 2d 39. Its policies and practices are dominated to the point that it has "no separate mind, will or existence of its own and is but a business conduit for its principal." 1 Fletcher, Cyclopedia Corporations, § 43, p. 205 (Perm. Ed. 1963). A court of equity

seeking to do justice among all parties looks at the spirit and not the form of transactions. *Trust Co. v. Spencer,* 193 N.C. 745, 138 S.E. 124. " 'It regards corporate organization objectively and realistically, unencumbered by fictions of corporate identity, and thus, brushing aside form, deals with substance.' " *Mills v. Building & Loan Assn.,* 216 N.C. 664, 6 S.E. 2d 549. Corporate identity offers no bar to equity's pursuit of the "plumb-line" of right dealing and fair accounting. *Erickson v. Starling,* 233 N.C. 539, 64 S.E. 2d 832. These principles compel the affirmance of the trial court's judgment.

The trial court held that plaintiff was also entitled to relief on other grounds, *i.e.:* (1) The transfer of assets to Park Road constituted a fraudulent conveyance under G.S. 39-15. (2) The gift of credit was beyond the power of Hillwest to make and Park Road to accept since it was not a gift to a charitable, literary or religious organization such as is set forth in G.S. 55-17(a)(6). (3) Park Road had no power to enter the loan agreement or to retain the assets since its corporate charter was under a state of suspension. Inasmuch as conclusions heretofore discussed entitle plaintiff to the relief granted, we find it unnecessary to inquire into the soundness of these additional grounds.

Affirmed.

Judges CAMPBELL and BRITT concur.