J. M. THOMPSON COMPANY v. DORAL MANUFACTURING CO., INC. AND
LMT STEEL PRODUCTS, INC.

No. 8410SC143

(Filed 5 February 1985)

**Constitutional Law § 24.7; Process § 14.3— foreign corporation—liabilities assumed by another foreign corporation—insufficiency of evidence—no showing of minimum contacts with North Carolina**

The evidence did not show minimum contacts between defendant LMT and North Carolina sufficient to meet constitutional due process standards and satisfy any of the grounds for *in personam* jurisdiction over foreign corporations of G.S. 1-75.4 or G.S. 55-145 where the evidence tended to show that plaintiff ordered hollow metal doors from defendant Doral which proved to be defective; plaintiff brought an action for damages due to breach of contract and due to unfair and deceptive trade practices; plaintiff alleged that the necessary minimum contacts existed because defendant LMT expressly con-

tracted to assume the liabilities of defendant Doral and because, by operation of the alter ego doctrine, all of defendant Doral's activities were imputed to defendant LMT; the only evidence of an agreement by LMT to assume Doral's liabilities was a contract to that effect which was not signed by defendant Doral's owner/president, and he testified that he had no independent recollection of that document or any negotiations or agreements which occurred at that time; and evidence that LMT purchased Doral's loan, took a security interest in Doral's assets, sent one of its employees to Doral as a consultant, supplied Doral with raw materials, occasionally shipped some of Doral's manufactured products to buyers at its own expense, took possession of Doral's equipment just before the company failed, and attempted to collect outstanding accounts did not demonstrate that Doral's finances, policies and practices were so dominated by LMT that Doral ceased to function as a separate corporate entity and that the alter ego doctrine should apply.

APPEAL by defendant from *Bailey, Judge.* Order entered 21 December 1983 in Superior Court, WAKE County. Heard in the Court of Appeals 25 October 1984.

*Casey, Haythe & Krugman, by Robert A. Ponton, Jr., and Samuel T. Wyrick, III, for plaintiff appellee.*

*Kimzey, Smith, McMillan & Roten, by Russell W. Roten, for defendant appellant.*

BECTON, Judge.

I

Plaintiff, J. M. Thompson Company (Thompson), a North Carolina corporation, brought this action against two New Jersey corporations, Doral Manufacturing Company, Inc. (Doral) and LMT Steel Products, Inc. (LMT), for damages due to breach of contract and due to unfair and deceptive trade practices. Both defendants answered separately; LMT's Answer contained an N.C. Gen. Stat. Sec. 1A-1, Rule 12(b)(2) (1983) motion to dismiss for lack of personal jurisdiction. After discovery, the Rule 12(b)(2) motion came on for hearing. The trial court denied LMT's motion to dismiss, and LMT appeals.

We conclude that the evidence did not show minimum contacts between LMT and North Carolina sufficient to satisfy due process standards and allow North Carolina to assert *in personam* jurisdiction against LMT. We, therefore, reverse the trial court's order.

II

Factual Background

LMT Steel Products was founded in 1950. Its shareholders and board of directors are Harry Teitelbaum, president, his brother, Joseph Teitelbaum, secretary-treasurer, and Joseph Makara, vice-president. LMT manufactures moveable steel office partitions, steel doors, and frames. Doral, like LMT, is a New Jersey corporation, and was founded in 1972 by Morton Mickenburg and Edwin Janka. Doral was engaged in manufacturing steel doors and frames.

No relationship existed between LMT and Doral, or between any of their shareholders, until 1977, when Harry Teitelbaum was introduced to Mickenburg. At that time, Harry Teitelbaum and Joseph Teitelbaum purchased a loan that Doral owed to the First National State Bank of New Jersey, taking a security interest in Doral's assets and equipment. Makara did not participate in this transaction. Mickenburg testified that sometime after the loan purchase and before 1979, all of Janka's shares of stock and half of the shares owned by Mickenburg were purchased by either LMT, or by Harry Teitelbaum, Joseph Teitelbaum, and Joseph Makara. Mickenburg testified that the remainder of his stock was sold to LMT in July 1981, and that at that time LMT also agreed to accept all of Doral's liabilities and obligations. Although no documentary evidence directly supports this testimony, a copy of a document dated 28 July 1981 was introduced into evidence. The document purports to terminate Mickenburg's relationship with Doral. An introductory paragraph recites that "prior hereto . . . [LMT] purchased the assets and assumed the liabilities of Doral." The signatures of Harry Teitelbaum and Joseph Makara appear on the document; however, the spaces above the names of Morton Mickenburg and Florence Mickenburg, his wife, are left blank. Harry Teitelbaum testified that neither LMT nor any of its three shareholders ever purchased any of Doral's stock, or otherwise acquired any ownership interest in Doral.

On 3 February 1981, Doral accepted a purchase order for hollow metal doors from the plaintiff, J. M. Thompson Company. Thompson was the contractor for the construction of the Veterinary School at North Carolina State University. Doral delivered the doors to the construction site in May 1981, July

1981, and December 1981. Thompson paid Doral part of the full price, but subsequently withheld the balance because of alleged defects in the doors and nonconformities with the purchase order.

Doral had been in financial trouble even before the loan purchase. Indeed, Doral was in default on the loan at the time of purchase. At some point after the loan purchase, LMT began to purchase the majority of steel used by Doral. Harry Teitelbaum estimates that LMT ultimately purchased several hundred thousand dollars worth of steel on behalf of Doral. Teitelbaum testified that he believed it was in his self-interest for LMT to supply Doral steel in this fashion. Presumably, Teitelbaum meant that only if Doral were kept financially afloat, would Doral ever again realize profits and thus be in a position to pay back the Teitelbaum brothers on the loan.

Beginning in about mid-1981, until Doral closed its doors in June 1982, Harry Teitelbaum sent Joseph Makara to Doral on a part-time daily basis. According to Harry Teitelbaum, Makara was sent to Doral to protect Teitelbaum's investment, specifically as an observer and to make recommendations concerning Doral's business operations. Makara agreed that he was sent to Doral to protect the economic interest of the Teitelbaums. Makara described his duties at Doral in terms of reviewing the financial state of that company; he testified that as long as Mickenburg was there, Mickenburg basically "ran the show." Makara also testified that at all relevant times his salary was paid by LMT. Mickenburg testified that Makara told him he was there to improve the operation of the factory, and that Makara was involved in "getting the factory's operation going properly." Harry Teitelbaum and Makara both testified that during the time Makara was at Doral, Makara reported to Teitelbaum at LMT on a bi-weekly basis to discuss Doral's business.

Although the parties disagree as to whether Morton Mickenburg unilaterally abandoned the business or left it after selling the remainder of his stock to LMT, the parties agree that he left Doral in late 1981. After Mickenburg's departure, Makara apparently supervised Doral's operations until it closed down in June 1982, although it is unclear exactly what his duties were. Because Harry Teitelbaum and his brother had a security interest in Doral's assets, after Doral closed down, they arranged to have Doral's equipment moved to LMT.

Plaintiff Thompson first wrote to Doral concerning defects in the shipment of doors in January 1982, and it continued attempts to solve this problem after Doral closed, by corresponding with Makara at LMT. No action was ever taken by either Doral or LMT to remedy the problem. Considering Doral's outstanding accounts among Doral's assets, LMT invoiced Thompson for the balance due on their account in December 1982 and again in June 1983. Thompson filed this action against both Doral and LMT on 4 March 1983.

### III

LMT's sole argument is that North Carolina lacks personal jurisdiction over it because none of the grounds in either of North Carolina's statutes conferring personal jurisdiction over a foreign corporation are satisfied. N.C. Gen. Stat. Sec. 1-75.4 (1983) is North Carolina's long-arm statute, and N.C. Gen. Stat. Sec. 55-145 (1982) provides an alternative basis for jurisdiction over foreign corporations not transacting business within this State. *Fiber Industries, Inc. v. Coronet Industries, Inc.*, 59 N.C. App. 677, 298 S.E. 2d 76 (1982) (G.S. Sec. 55-145 alternative to G.S. Sec. 1-75.4). Plaintiff, however, contends that any of the following grounds justify North Carolina's exercise of *in personam* jurisdiction over LMT: that LMT is engaged in substantial activity within North Carolina, G.S. Sec. 1-75.4(1)(d) (1983), that the action arose out of a promise made to plaintiff by defendant to deliver goods within the State, G.S. Sec. 1-75.4(5)(c) (1983), and that the action relates to goods received by plaintiff from defendant in North Carolina, G.S. Sec. 1-75.4(5)(e) (1983). Plaintiff further cites G.S. Sec. 55-145(a)(1) (1982), which subjects a foreign corporation to suit when the action arises out of a contract made or to be performed in North Carolina, and G.S. Sec. 55-145(a)(3) (1982), which subjects a foreign corporation to suit when it produces, manufactures, or distributes goods with the reasonable expectation that they will be consumed in North Carolina and they are so consumed.

We first review the standards by which *in personam* jurisdiction is measured. The burden of proof is on the plaintiff to show by a preponderance of the evidence that LMT's acts placed it within the reach of North Carolina's long-arm statutes. *See Marshall Exports, Inc. v. Phillips*, 507 F. 2d 47 (4th Cir. 1974) (similar motion treated as tendering issue of fact). Absent a request by

the parties, the trial judge is not required to find the facts upon which the ruling on a motion is based; instead, it will be presumed that the judge, upon proper evidence, found facts sufficient to support the judgment. *City of Salisbury v. Kirk Realty Co.*, 48 N.C. App. 427, 268 S.E. 2d 873 (1980); N.C. Gen. Stat. Sec. 1A-1, Rule 52(a)(2) (1983). LMT did not request the trial court to make findings of fact and conclusions of law. Thus, the issue before us is one of sufficiency of the evidence, *see Gro-Mar Public Relations, Inc. v. Billy Jack Enterprises, Inc.*, 36 N.C. App. 673, 245 S.E. 2d 782 (1978), and if the presumed findings of fact are supported by competent evidence, they are conclusive on appeal despite evidence to the contrary. *Fungaroli v. Fungaroli*, 51 N.C. App. 363, 276 S.E. 2d 521, *disc. rev. denied*, 303 N.C. 314, 281 S.E. 2d 651 (1981) (Court of Appeals articulated what trial court's findings of fact must have been).

The resolution of a question of *in personam* jurisdiction over a foreign corporation, as with any determination of personal jurisdiction, involves a two-part determination: (1) Does a statutory basis for personal jurisdiction exist, and (2) If so, does the exercise of this jurisdiction violate constitutional due process? *E.g., Dillon v. Numismatic Funding Corp.*, 291 N.C. 674, 231 S.E. 2d 629 (1977); *HBD, Inc. v. Steri-Tex Corp.*, 63 N.C. App. 761, 306 S.E. 2d 516 (1983). However, it has been held that long-arm legislation was intended to make available to North Carolina courts the full jurisdictional powers permissible under due process. *See Dillon v. Numismatic Funding Corp.*; R. Robinson, *North Carolina Corporation Law and Practice* Sec. 32-1 at 475-78, 478 n. 18 (3d ed. 1983). Therefore, since the "statutory authorization for personal jurisdiction is coextensive with federal due process, the critical inquiry in determining whether North Carolina may assert *in personam* jurisdiction over a defendant is whether the assertion . . . comports with due process." *Rose's Stores, Inc. v. Padgett*, 62 N.C. 404, 410, 303 S.E. 2d 344, 348 (1983) (quoting *Kaplan School Supply Corp. v. Henry Wurst, Inc.*, 56 N.C. App. 567, 570, 289 S.E. 2d 607, 609, *disc. rev. denied*, 306 N.C. 385, 294 S.E. 2d 209 (1982) ).

The modern federal due process test was first promulgated in *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 90 L.Ed. 95, 66 S.Ct. 154 (1945). This test requires a nonresident defendant to have had "minimum contacts" with the forum state before that state may

exercise personal jurisdiction over the defendant. The frequently quoted refinement of this rule appears in *Hanson v. Denckla*, 357 U.S. 235, 2 L.Ed. 2d 1283, 78 S.Ct. 1228 (1958):

> The application of [the minimum contacts] rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

357 U.S. at 253, 2 L.Ed. 2d at 1298, 78 S.Ct. at 1240 (quoted in *Rose's Stores, Inc. v. Padgett; Gro-Mar Public Relations, Inc. v. Billy Jack Enterprises, Inc.*). What contacts with the forum state constitute minimum contacts for jurisdictional purposes is ultimately a fairness determination: the defendant's conduct and connection with the forum state must be such that it "reasonably anticipate[s] being haled into court there." *Bush v. BASF Wyandotte Corp.*, 64 N.C. App. 41, 46, 306 S.E. 2d 562, 566 (1983) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 62 L.Ed. 2d 490, 501, 100 S.Ct. 559, 567 (1980)); *see Int'l Shoe Co. v. Washington* (maintenance of suit not to offend "traditional notions of fair play and substantial justice"). *See also Byham v. Nat'l Cibo House Corp.*, 265 N.C. 50, 143 S.E. 2d 225 (1965) (listing factors to be considered in determining the constitutionality of exercising jurisdiction).

## IV

In applying the foregoing law to the instant case, plaintiff argues that the necessary contacts exist by advancing two separate contentions: that LMT expressly contracted to assume the liabilities of Doral, and that by operation of the *alter ego* doctrine, all of Doral's activities are imputed to LMT.

As to plaintiff's first contention, we note that the 28 July 1981 contract is the only evidence offered as proof of LMT's assumption of Doral's liabilities. The copy was not signed by either Morton or Florence Mickenburg, and Morton Mickenburg testified that he had no independent recollection of that document, nor any recollection of negotiations or agreements that occurred at that time. In our opinion, this does not constitute competent evidence that LMT agreed to assume Doral's liabilities.

As to whether the *alter ego* doctrine may be used to establish *in personam* jurisdiction over LMT, plaintiff reasons that Doral did not contest North Carolina's exercise of jurisdiction over it, and because LMT was the *alter ego* of Doral, this assertion of jurisdiction over Doral must be imputed to LMT. We agree that Doral, by entering into a contract with Thompson, and delivering the materials to the job site, had sufficient minimum contacts with North Carolina to constitutionally justify the exercise of personal jurisdiction over it. We do not agree, however, that the relationship between the two corporations was such that North Carolina's *in personam* jurisdiction over Doral can be lawfully extended to LMT.

> The 'alter ego' or 'instrumentality' doctrine states that: '[W]hen a corporation is so dominated by another corporation, that the subservient corporation becomes a mere instrument, and is really indistinct from the controlling corporation, then the corporate veil of the dominated corporation will be disregarded, if to retain it results in injustice.'

*Pilot Title Ins. Co. v. Bank*, 11 N.C. App. 444, 450, 181 S.E. 2d 799, 803 (1971) (quoting *Nat'l Bond Finance Co. v. Gen'l Motors Corp.*, 238 F. Supp. 248, 255 (1964), *aff'd per curiam*, 341 F. 2d 1022 (8th Cir. 1965)). A recent case from this Court stressed the degree of control over the dominated corporation necessary to invoke the doctrine:

> 'The control necessary to invoke what is sometimes called the "instrumentality rule" is not mere majority or complete stock control but such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal. It must be kept in mind that *the control must be shown to have been exercised at the time the acts complained of took place in order that the entities be disregarded at the time.'*

*Glenn v. Wagner*, 67 N.C. App. 563, 577, 313 S.E. 2d 832, 841 (1984) (quoting *B-W Acceptance Corp. v. Spencer*, 268 N.C. 1, 9, 149 S.E. 2d 570, 576 (1966)).

Even if we assume that Morton Mickenburg's unsupported testimony is correct, and that at some relevant point, LMT pur-

chased all of Doral's stock, the cases make clear that stock owner-ship alone is not determinative. *See, e.g., Glenn v. Wagner.* Rather, in deciding whether LMT is the *alter ego* of Doral, we need to evaluate all the pertinent circumstances to determine whether the requisite control existed.

Our review of the evidence satisfies us that the affiliation between LMT and Doral does not establish that the former con-trolled the latter to the extent that Doral had no separate cor-porate existence. The evidence shows only that the Teitelbaum brothers purchased Doral's loan, took a security interest in Doral's assets, and that when Doral's business continued to flounder, Harry Teitelbaum sent Joseph Makara to Doral as a consultant. Even Mickenburg's testimony does not indicate that Makara ran Doral, or that he participated in making decisions af-fecting the business. In a further effort to protect the investment of the Teitelbaum brothers, LMT supplied Doral with raw materials for a time, and also occasionally shipped some of Doral's manufactured products to buyers at LMT's expense. After Mickenburg left the company, because the Teitelbaum brothers held a valid security interest in Doral's assets, they took posses-sion of Doral's equipment and also attempted to collect outstand-ing accounts. None of this evidence demonstrates that Doral's finances, policies and practices were so dominated by LMT that Doral ceased to function as a separate corporate entity and became a mere "phantom" or "puppet" corporation. *Pilot Title Ins. Co. v. Bank; see Glenn v. Wagner* (despite some unified ad-ministrative control, evidence did not show "complete identity of interest" between the two corporations).

LMT's activities were designed to protect the economic in-terest of the Teitelbaum brothers in the loan which they had pur-chased. They were not contacts with North Carolina that invoked the benefits and protections of its laws. If, by merely acquiring and subsequently protecting an economic interest in a foreign cor-poration, a person became responsible for every obligation in-curred by that corporation, and subject to suit in whatever state the corporation happened to be located or incorporated, a negative impact on corporate investing and mergers would result. We find no justification in logic or law for discouraging in-vestments in this fashion.

The fact that Doral and LMT were engaged in the same type of business does not affect the result here. Plaintiff's attempt to transform LMT's actions in protecting an investment in a corporation involved in manufacturing products similar to its own, into actions which prove that LMT controlled Doral, is not persuasive. Furthermore, for the *alter ego* doctrine to be satisfied, it must be shown that control was exercised at the time the acts complained of transpired. *See Glenn v. Wagner,* as quoted. Joseph Makara was not sent to Doral until after the contract between Doral and plaintiff Thompson had been entered into, and most of the materials had been delivered.

V

In conclusion, we hold that the evidence did not show minimum contacts between LMT and North Carolina sufficient to meet constitutional due process standards and satisfy any of the grounds for *in personam* jurisdiction over foreign corporations of G.S. Sec. 1-75.4 (1983) or G.S. Sec. 55-145 (1982). The judgment of the trial court must be reversed and the cause remanded for a new order consistent with this opinion.

Reversed and remanded.

Judges ARNOLD and WELLS concur.