Charles R. HASSINGER, Administrator
of the Estate of Stanley H. Hassinger,
III, Plaintiff,

v.

TIDELAND ELECTRIC MEMBERSHIP
CORPORATION, Coleman Company,
Inc., and Coast Catamaran Corporation, Defendants.

Janet Mead PROCTOR, Administratrix
of the Estate of Robert Diego
Proctor, Plaintiff,

v.

TIDELAND ELECTRIC MEMBERSHIP
CORPORATION, Coleman Company,
Inc., and Coast Catamaran Corporation, Defendants.

Nos. 83–1077–CIV–5, 83–1078–CIV–5.

United States District Court,
E.D. North Carolina,
Raleigh Division.

Oct. 31, 1985.

McNeill Smith, H. Miles Foy and E. Garrett Walker, Smith Moore Smith Schell & Hunter, Greensboro, N.C., for plaintiffs.

George R. Ragsdale, Moore, Ragsdale, Liggett, Ray & Foley, Armistead J. Maupin, Maupin, Taylor & Ellis, Raleigh, N.C., and Robert M. Hughes, III, Seawell, Daughton Hughes & Tims, Norfolk, Va., for defendants.

## MEMORANDUM OF DECISION

JAMES C. FOX, District Judge.

### I. BACKGROUND

These cases arise from the electrocutions of three men, Stanley H. Hassinger, III, Robert D. Proctor, and Stuart L. Powell, which occurred on June 5, 1982, at Silver Lake in Okracoke, North Carolina. The men were killed while beaching Hassinger's 18–foot Hobie Cat sailboat when the top of the mast contacted an overhead power line. Named as defendants in this action are Tideland Electric Membership Corporation ("Tideland"), as the owner and operator of the electric power line, and Coleman Company, Inc. ("Coleman"), and Coast Catamaran Corporation ("Coast"), as the alleged designers, manufacturers and sellers of the Hassinger Hobie Cat sailboat. By order dated April 18, 1985,[1] this court denied defendants' motions to dismiss for lack of admiralty jurisdiction, as well as defendants Coleman and Coast's motion to dismiss plaintiffs' strict liability claim. In this same order, however, the court granted defendant Tideland's motion to dismiss plaintiffs' federal question claims. These cases are presently before the court on defendant Coleman's motion for summary judgment, filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. As the

---

1. A detailed account of the facts surrounding this accident can be found in this order, and therefore will not be repeated herein.

basis for its motion, Coleman asserts the following:

1. It did not design, manufacture, or market the eighteen-foot Hobie Cat; furthermore, because it did not manufacture or sell the sailboat, it made no warranties in connection therewith.[2] AND,

2. The defendant Coast is not an instrumentality, conduit or alter ego of Coleman, and therefore Coleman has no liability for Coast's acts.

This motion has been thoroughly briefed by all necessary parties, and is now ripe for disposition.

## II. FACTS

The facts, well summarized at pages 3–24 of plaintiffs' Brief in Opposition to Motion for Summary Judgment, as taken from various depositions and answers to interrogatories, demonstrate the following:

In 1976 Coleman acquired 100% of Coast's shares of common stock, and installed one of its own officers,[3] Douglas Campbell, as president of Coast. Since 1976, Coleman has elected all the directors of Coast, some of whom also have been officers of Coleman.[4]

After Campbell became president of Coast in 1976, he instituted a Product Development Committee (hereinafter PDC), which was comprised of Coast employees[5] and met monthly; chief executive officers from Coleman regularly received copies of the committee's minutes. The PDC was responsible for all design changes in Coast's existing products, as well as initiating, controlling, and monitoring all future new product projects. As President of Coast, Campbell was ultimately responsible for the actions taken by the PDC. Campbell, however, reported on a regular basis all matters under his supervision and direction to Larry Jones, President of Coleman. In fact, any capital expenditure by Coast (e.g. purchase of equipment, buildings, machinery, land, etc.) exceeding $50,000 was required to be approved by Larry Jones.[6] Furthermore, Campbell's salary was determined by the Compensation Committee of Coleman's Board of Directors; additionally, his compensation included participation in a profit-sharing bonus plan adopted by Coleman.[7]

Coleman provides many services to Coast; specifically, these services include travel, legal, public, personal and industrial relations, distributions, credit, insurance, and accounting and information systems. In 1976 Hal Pfountz, a lawyer with Coleman, was assigned, with Campbell's consent, to correlate and follow up on all of Coast's product liability matters. This involvement included assisting in the coordination and preparation of litigation in which Coast was involved, even in cases in which Coleman was not a named defendant. In addition, Pfountz served as legal adviser of the Coast Catamaran design department. In this capacity, he made recommendations as to whether a warning label ought to be applied to the mast, whether a fiberglass tiller should be adopted, whether testing ought to be conducted for an insulating mast plug and how extensive that testing ought to be, and whether a fiberglass mast ought to be pursued by Coast Catamaran. He also was a participant in the decision for Coast Catamaran to send a

---

**2.** There is no real dispute on this point. The question herein is whether or not Coleman is liable as the designer, manufacturer and seller of the Hobie Cat because Coast is its alter ego.

**3.** Douglas Campbell has been corporate vice-president of Coleman since 1977.

**4.** Larry Jones, President of Coleman; Lawrence Keller, Senior Vice-President for Corporate Development and Law of Coleman; and John Reiff, Secretary of Coleman.

**5.** In 1976, the PDC members were: Hobie Alter, Jim Black, Jerry Blakely, Sandy Banks, Chuck Conrey, Drew Holland, and Fred Weishar.

**6.** Campbell could not recall the dollar limitations for 1976 at the time of his deposition, but related that the 1984 policy required him to inform Coleman when capital expenditures exceeded $50,000.

**7.** Campbell received bonuses pursuant to this plan every year except one between the years of 1976 and 1984.

warning letter to all power companies in 1979.

In addition to these services, the finances of Coast and Coleman are also intertwined. Coast lends money to Coleman, if Coleman needs it, and vice versa. In its answer to plaintiffs' interrogatory no. 41, Coleman stated that:

> This defendant and Coast Catamaran Corporation maintain separate books and bank accounts. Coast deposits funds which it accumulates in bank accounts maintained in its name which are thereafter transferred to this defendant on a periodic basis. Coast draws up funds from bank accounts in its name which are provided by this defendant as needed. A balance between the acquisition from Coast and deposits to Coast is maintained as a loan in favor of the appropriate company with interest at prime. This loan is carried forward at the end of each accounting period based upon transactions during that time. There have been no capital contributions by this defendant to Coast; however, this defendant paid in excess of $3,000,000.00 for the capital stock of Coast.

Furthermore, Coleman does not have to request Coast's permission before withdrawing money from Coast's bank accounts.

Finally, the Hobie Cat and Coleman trademarks frequently are published jointly. *See, e.g.,* 1980 and 1982 Coleman Annual Reports; Retail Sales Brochure for Hobie Cat 18 sailboats; Hobie 18 Assembly Manual; Business Cards used by Coast's salesmen; Retail Dealer Cards.

## III. LAW APPLICABLE TO THE ISSUE OF WHETHER THE SEPARATE CORPORATE ENTITY OF COAST OUGHT TO BE DISREGARDED

■ The plaintiffs argue that the law applicable to this issue is the law of Califor-

nia, the state of incorporation of Coast Catamaran. The court does not agree, however, and finds that North Carolina law governs in this diversity action.[8]

The doctrine of conflicts of law is a question of local common law, and therefore "[w]hen this conflict question is presented, the federal court is bound to decide it according to the law of conflicts of the State in which it ... [is] sitting." *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 491, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). *See also Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The choice of law rule in North Carolina for personal injury and wrongful death actions is clear—"North Carolina courts have unequivocally adhered to the *lex loci delicti* rule." *Santana, Inc. v. Levi Strauss and Co.,* 674 F.2d 269, 272 (4th Cir.1982). The *"lex loci delicti,"* or "place of the wrong," "is the state where the last event necessary to make an actor liable for an alleged tort takes place." Black's Law Dictionary 820 (5th ed. 1979). *Santana,* 674 F.2d at 272. With respect to contract actions, the law of the state "where the contract is made is the rule by which the validity of it, its exposition, and consequences are to be determined." *Fast v. Gulley,* 271 N.C. 208, 155 S.E.2d 507, 509 (1967). Furthermore, as to breach of warranty actions, "liability is determined in accordance with the law of the place of sale." *Richard W. Cooper Agency, Inc. v. Irwin Yacht and Marine Corp.,* 46 N.C. App. 248, 264 S.E.2d 768 (1980).

In applying these choice of law rules, there is no question but that North Carolina law applies to each of plaintiffs' claims. The decedents were electrocuted in Okracoke, North Carolina, and the Hassinger Hobie Cat was purchased in Raleigh, North Carolina. Therefore, the court finds that North Carolina law is applicable to the issue of whether the separate corpo-

---

**8.** The plaintiffs also argue that *Ogg v. City of Springfield,* 121 Ill.App.3d 25, 76 Ill.Dec. 531, 458 N.E.2d 1331 (1984), which found Coleman liable for injuries caused by an accident involv-

ing a Hobie Cat, is controlling. The case applied Illinois law, however, which is not applicable to the case at bar.

rate entity of Coast ought to be disregarded.

## IV. DISREGARDING THE SEPARATE CORPORATE ENTITY OF COAST CATAMARAN

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure should be granted only when it is clear that no issue of fact is involved. Though the evidentiary facts are not disputed, if conflicting inferences could be drawn from those facts, summary judgment cannot be granted. *See, e.g., Phoenix Savings & Loan, Inc. v. Aetna Casualty & Surety Co.,* 381 F.2d 245, 249 (4th Cir.1967). The court finds that there are no issues of fact involved herein. Resolution of the issue presently before the court requires a construction of the meaning of North Carolina law and whether, as a matter of law, with respect to the design, manufacture and sale of the Hassinger Hobie Cat, Coast was a mere instrumentality of Coleman.

In disregarding a corporate entity, North Carolina applies what is called the "alter ego" or "instrumentality" doctrine. This doctrine states that "when a corporation is so dominated by another corporation that the subservient corporation becomes a mere instrument, and is really indistinct from the controlling corporation, then the corporate veil of the dominating corporation will be disregarded, if to retain it results in injustice." *National Bond Finance Co. v. General Motors Corp.,* 238 F.Supp. 248 (W.D.Mo.1964), *aff'd,* 341 F.2d 1022 (8th Cir.1965), *quoted in Pilot Title Insurance Co. v. Northwestern Bank,* 11 N.C.App. 444, 450, 181 S.E.2d 799, 803 (1971). Complete stock ownership, identical boards of directors, common officers, and transaction of business for each other, do not make one corporation liable for the action of another. 11 N.C.App. at 450, 181 S.E.2d at 803; *Henderson v. Security Mortgage & Finance Co.,* 273 N.C. 253, 160 S.E.2d 39, 44 (1968); *Huski-Bilt, Inc. v. First Citizens Bank & Trust Co.,* 271 N.C. 662, 668, 157 S.E.2d 352, 358 (1967); *B–W Acceptance Corp. v. Spencer,* 268 N.C. 1,

149 S.E.2d 570 (1966). The control necessary to invoke the "instrumentality rule" is "such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal. [Furthermore,] [i]t must be kept in mind that the control must be shown to have been exercised at the time the acts complained of took place in order that the entities be disregarded at the time." 1 Fletcher, Cyclopedia Corporations, perm. ed., p. 204 *et seq., quoted in Huski-Bilt, Inc.,* 271 N.C. at 670–71, 157 S.E.2d at 358. Finally, "such control must have been used ... to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of [a] plaintiff's legal rights"; also this control "must proximately cause the injury ... complained of." *Lowendahl v. Baltimore & O.R. Co.,* 247 App.Div. 144, 287 N.Y.S. 62, 76 (1936), *aff'd,* 272 N.Y. 360, 6 N.E.2d 56, *quoted in Huski-Bilt, Inc.,* 271 N.C. at 670–71, 157 S.E.2d at 358. Only when these elements are present—complete domination and control at the time the act complained of took place, which is used to commit a fraud, violation of a legal duty or a dishonest act in contravention of a plaintiff's legal rights, which in turn proximately causes the injury—will the corporate entity be disregarded and the corporation and the shareholder be treated as one and the same person.

North Carolina law thus recognizes that under some circumstances the corporate entity may properly be disregarded and personal liability imposed on the shareholder or shareholders of whom the corporation is the alter ego. *See, e.g., Pilot Title Insurance Co. v. Northwestern Bank,* 11 N.C.App. 444, 181 S.E.2d 799 (1971); *Henderson v. Security Mortgage & Finance Co.,* 273 N.C. 253, 160 S.E.2d 39 (1968). These circumstances are present, however, only when the corporate entity is a mere shell, device, or puppet of the shareholder or shareholders.

In *Pilot Title Insurance Company,* defendant Northwestern endorsed certain as-

sets to Park Road Professional Center, Inc. ("Park Road"). In holding that Northwestern completely dominated Park Road and therefore in endorsing the assets from the loan agreement in question to Park Road, it did nothing more than endorse these assets to itself, the court found the following facts—

The named president of Park Road was named only for the purpose of executing the loan agreement in question; furthermore, this loan agreement was the only thing he ever engaged in on behalf of Park Road. The president's own testimony established that he knew nothing about the affairs of Park Road, and little about the loan agreement he had signed. Additionally, the corporate charter of Park Road was in a state of suspension at all pertinent times. Its only stock certificate was lost. Its purported president had never seen any minute books, tax returns or corporate records. No corporate secretary attested the signature of the purported president of Park Road to the loan agreement. No corporate seal was affixed thereto. And finally, no corporate officer, or anyone else verified or signed the answer in the case on behalf of Park Road. 11 N.C.App. 444, 181 S.E.2d at 804. Accordingly, the court found that Park Road was a "corporate phantom" which "exists as a mere puppet and device." Therefore, the requisite complete domination and control, not only of finances, but of policy and business practices in respect to the transaction attacked, was found to exist.

The critical factor in the alter ego determination in *Henderson v. Security Mortgage & Finance Company*, was that, as testified to by the corporate president, no effort was made to operate the corporation as an entity separate and distinct from his private interests.[9] 273 N.C. at 260, 160 S.E.2d at 44. The corporate entity therefore was found to be a "mere device or puppet in ... [the shareholders'] hands." *Id.* Because usury was involved in *Henderson*, the element of fraud was also clearly present; the existence of this ele-

ment was also critical to the court's determination. "[W]hen the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons." *U.S. v. Milwaukee Refrigerator Transit Co., C.C.*, 142 F. 247, 255 (1905), *quoted in Henderson*, 273 N.C. 253, 160 S.E.2d at 44–45.

These two cases demonstrate the very limited set of circumstances in which the corporate entity may properly be disregarded in North Carolina. Such a disregard of Coast Catamaran, the corporate entity herein, is not warranted in the case at bar. Plaintiffs' evidence in a light most favorable to them does not show complete domination and control by Coleman at the time the Hassinger Hobie Cat was designed, manufactured and sold. Coleman does not so dominate the finances, policies and practices of Coast Catamaran that Coast has no separate mind, will or existence of its own.

Under the alter ego test stated above, plaintiffs' evidence fails to allege sufficient facts to raise the alter ego question in two respects. First, plaintiffs' evidence is insufficient to show the requisite control by Coleman in Coast's manufacturing and design process. Coast's Product Development Committee, which is comprised of Coast employees, is responsible for all design changes in Coast's existing products, as well as initiating, controlling, and monitoring all future new product projects. Furthermore, the president of Coast, Douglas Campbell, is ultimately responsible for the actions taken by this committee. Although Campbell's salary is determined by Coleman, and he reports all matters under his supervision and direction on a regular basis to the president of Coleman, Coleman does not so dominate Coast as to the manufacture and sale of Catamarans that Coast has no separate mind, will or existence of its own. Plaintiffs' evidence is simply insufficient to show that Coast is a corporate phantom which exists as a mere puppet and

**9.** The corporate president and his wife were the sole shareholders of the corporate entity.

device of Coleman with respect to the manufacture and design process. North Carolina cases are clear that this type of control is required in order to invoke the instrumentality doctrine.

Secondly, even assuming plaintiffs have presented the requisite demonstration of control by Coleman of Coast, they have failed to present any evidence that such "control" was used to commit a fraud or wrong or to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act. Even if complete control exists, some additional circumstances of fraud are necessary in order to invoke the instrumentality doctrine. *Ram Textiles, Inc. v. Hillview Mills, Inc.*, 47 N.C. App. 593, 267 S.E.2d 700, 703 (1980); *Huski-Bilt, Inc. v. First Citizens Bank & Co.*, 271 N.C. 662, 157 S.E.2d 352 (1967).

Accordingly, the court holds that the evidence considered in the light most favorable to plaintiffs does not entitle them to have the jury pass on the instrumentality or alter ego claim and therefore defendant Coleman's motion for summary judgment is GRANTED.

SO ORDERED.